[LOCAL LAW.]

## BLUNT's Lessee v. SMITH and Others.

The decision of the Court below, granting or refusing a motion for a new trial, is not matter for which a writ of error lies to this Court.

In Kentucky and Virginia the rule is, that a Court of common law cannot look beyond the patent; but in Tennessee the Courts of law, under their construction of the land laws of North Carolina, permit the parties in an ejectment to go back to the original entry, and connect the patent with it.

This construction is not limited to a comparison of the dates of the entries, but admits of an inquiry into their legal effect as they stand in relation to each other.

The statutes of North Carolina, which have been construed to justify a Court of law in considering the entry as the commencement of title, are applicable to military warrants as well as other titles.

By the decisions of the Courts of Tennessee, the validity of surveys does not depend on the will or directions of claimants; and though the mistakes of surveyors may be corrected, they cannot be corrected so as to injure a subsequent adjoining enterer.

The laws of North Carolina do not require that an entry should express the water courses and remarkable places which are remote, but only those which are contiguous, and which may assist in designating the land intended to be acquired.

*Notoriety* is not essential to the validity of an entry in Tennessee, as it is in Kentucky. The statute of Virginia, which is the land law of Kentucky, requires that entries shall be so special and certain that any subsequent locator may know how to appropriate the adjacent residuum. But the land law of North Carolina contains no such provision, and the doctrine which requires *notoriety* as well as *identity*, has never been received in Tennessee.

1822.

Blunt's
Lessee
v.
Smith.

ERROR to the Circuit Court of West Tennessee. This was an action of ejectment, brought by the plaintiff in error, in the Circuit Court, against the defendants in error, to recover the possession of lands in the State of Tennessee. The title of the plaintiff, as spread upon the record, originated in an entry made on the 17th of March, 1785, in the following words: " General Sumner enters 12,000 acres of land, lying east of the upper south road, between the head of Mile Creek, Little Harpeth, and Stewart's Creek, and on the waters of some of the aforementioned creeks, including some deadened trees, marked I. F." The deadened trees were never found. On this entry a patent was issued by the State of North Carolina, on the 27th day of April, 1793, to which

was attached a platt and certificate of survey purporting to be made by Thomas Malloy, a deputy surveyor, on the 20th of November, 1786.

The defendants claimed under a patent issued to William Tyrrell, assignee, on the 10th of April, 1797. This grant was founded on an entry made in the name of John Gee, on the 1st of June, 1785, in the following words: "John Gee, heir of Captain James Gee, enters three thousand eight hundred and forty acres of land, lying and adjoining the northern boundary of Brigadier General Jethro Sumner, running west along his line for complement."

The defendants gave in evidence the record of a former trial in ejectment for the same land, in which the verdict and judgment were against the plaintiffs, and the testimony of Burkley Pollock, a witness examined at that trial, who is since dead, and who swore that he made the survey for General Sumner before Gee's entry was made. A copy of the platt and certificate of survey made by Pollock, and recorded in the Secretary's office of North Carolina, properly authenticated, was also given in evidence. By the platt and certificate of survey. it appears that the land of Sumner was laid off by Pollock, in a parallelogram, the base or first line of which extending from west to east, was 1292 poles, and the side lines 1486 poles. The patent which was issued on the platt and certificate returned by Malloy, had the same base line, but the side line is extended to 1737 poles, and the survey is said to include 2026 acres, belonging to Lieutenant Thomas Pasteur.

The defendants also gave in evidence copies of a petition presented to the General Assembly of North Carolina, at their session held in November, 1786, by the guardian of the plaintiff, praying that a separate warrant might be issued to the heirs of General Sumner for the quantity of land included in his survey to which Lieutenant Pasteur had a prior title, and the proceedings of the legislature, granting the prayer of the petition. The defendants also gave in evidence a certified copy of a certificate granted by the Commissioners of West Tennessee to the heirs of General Sumner, for so much land as was equal to the quantity lost by the prior title of Lieutenant Pasteur, and a copy of the testimony on which this certificate was founded.

To the admission of all these copies, it is stated in the bill of exceptions the plaintiff's counsel objected, but his objections were overruled, and the papers were read.

Some testimony was offered by the defendants, to prove that in the survey of Sumner's land by Pollock, a second as well as the first line was run, and corner trees marked at the end of that line, so as to fix the northern boundary of Sumner's land ; but other testimony was offered by the plaintiff to prove that only the first line, which established the southern boundary, was run.

After the testimony was closed, the counsel for the plaintiff moved the Court to instruct the jury, "that they should not regard the said copies from the Secretary's office of North Carolina, and of the proceedings before the Commissioners of West Tennessee as

having any effect in the said cause; and that the entry in the name of Gee, on which the grant to Tyrrel purported to be founded, could not be located as a special entry to any place, or if to any place, only to the northern boundary of Sumner's land on which the grant was founded, as granted and described in the platt and certificate;" but the judge refused so to instruct the jury, but informed them that all said documents, except the proceedings before the Commissioners, which should have no weight in the cause, should be considered as testimony by them: and that the platt and certificate made by Pollock, if he marked no more of the corners and lines of Sumner's tract, but the southern boundary, and south east-corner and south-west corner, would show, by calculation, where the northern boundary of his tract should be according to said platt, and locate said Sumner's entry and land to the south of that line, and fix said entry in the name of Gee to the north of that line, and make it special from the date of the survey made by Pollock for that place; and that the grant to Tyrrel, although founded on a survey made long after the grant to Sumner was issued, should relate back to the date of said entry, and give a good title to those holding under the said grant to the land north of the north boundary as represented in the platt, &c. made by Pollock, against the title derived from Sumner's grant and entry; and that Sumner's grant should be considered as made on a removed warrant, for all the land north of what is represented in said platt, made by Pollock, as his northern boundary."

Mr. *Gaston*, for the plaintiff in error, argued, that the practice which prevails in the State of Tennessee, of permitting a younger to compete with an elder grantee in ejectment, by reason of the elder and better entry of such younger grantee, was admitted in the Tennessee adjudications to be an usurpation on the part of the Courts of law introduced since the year 1798, and now too long established to be questioned.[a]   All agree that this innovation is not to be carried beyond its ascertained limits.[b]   To this well meant but impolitic assumption of power in their Courts of Law is ascribed, with one voice, the fatal uncertainty of the Tennessee land laws.[c]   The eldest grant is esteemed conclusive evidence of title except in the single case of an elder legal entry.[d] And every species of evidence to make a younger compete with an elder grant, shall be rejected except the entry.[e]   The acts of N. Carolina of 1786, c. 20 and 1787, c. 23. are the only statutes authorizing a Court of law to go beyond the grant in the examination of land claims, and under these the Courts have gone far enough, to say the least of it, when they look to the entry.[f]   Under these statutes, declaring an elder grant founded on a younger entry

1822.

Blunt's
Lessee
v.
Smith.

*Feb.* 25th.

*a*  Wilson v. Kilcannon, 1 *Tenn. Rep.* 205.

*b*  1 *Tenn. Rep.* 409. 411.   2 *Tenn. Rep.* 153, 154.   1 *Cooke's Rep.* 32. 5 *Hayw. Rep.* 402.

*c*  2 *Tenn. Rep.* 17. 5 *Hayw.* 102.   Polk's Lessee v. Wendel, 5 *Wheat. Rep.* 302.

*d*  1 *Cooke's Rep*, 133.

*e*  Reid v. Buford, 1 *Tenn. Rep.* 420.

*f*  Lester v. Craig, 1 *Cooke's Rep.* 485. 487.

void, the Tennessee Courts have decided that the priority of entries is examinable at law, and that a junior patent founded on a prior entry shall prevail in an action of ejectment against a senior patent founded on a junior entry; but this doctrine has never been extended beyond the cases which have been construed to be within the express purview of these statutes.[a]

It must be conceded, that in some of the Tennessee decisions military grants have been regarded as liable to the application of the same rule of preference from priority of entry or locations, as had been established in cases of grants founded on ordinary entries. It is difficult to say, when an error shall be deemed too inveterate to be corrected. Perhaps this may be the case with respect to the application of this rule to military grants. If it be not, nothing can be more easy than to show, that admitting the rule to be correct, military grants ought not to be brought within the sphere of its operation. The act of 1777, c. 1. opened a land office in North Carolina for the sale of vacant and unappropriated lands. The 4th and 5th sections prescribe as terms and conditions of the sale, payment by the purchaser of the required price, and a description in writing specifying the quantity and defining the situation of the land which he buys. This land office was shut by the act of 1781, c. 7. It was again opened by the act of 1783, c. 2. entitled "An act for opening the land office, for the redemption of

a Robinson v. Campbell, 3 Wheat. Rep. 221.

specie and other certificates and discharging the arrears due to the army." The 10th and 11th sections of this act require that the individual wishing to enter a claim for vacant land, shall pay the price of it to the entry taker, and deliver a writing signed with his name, setting forth where the land shall be situated; and that the entry taker shall endorse this written claim (or location) with the name of the claimant, and record it in his entry-book, and in due time shall issue to the surveyor a warrant commanding him to survey for the claimant the land described in such entry. When the act of 1777 was passed, an appropriation of lands as a retribution for military service had not been contemplated, and the act of 1783, above referred to, expressly excepts from entry (sec. 12.) all lands lying within the bounds reserved for the officers and soldiers of the Continental line. The act of 1779, c. 6, which was also passed before an appropriation of lands for military services directs the surveyor, where entries interfere, (sec. 6.) to survey the eldest entry first. The act of 1783, above referred to, under which military lands are forbidden to be entered, provides that all the warrants for entries shall be delivered by the entry taker to the surveyor on certain prescribed days, and that the surveyor shall proceed in his surveys in the order of the numbers and dates of the entries. All these enactments proceed upon the obvious principle that the first person who has bought and paid for any particular tract of land shall be entitled to a grant for it. The act of 1786, c. 20. and the act of 1787, c. 23. "from which alone the Courts of law claim an authority to go beyond the grant in

1822.

Blunt's
Lessee
v.
Smith.

the examination of land claims, and beyond the express purview. whereof this doctrine ought not to be carried,"[a] are each of them, in *title*—in *preamble*—in express *enactment*, definitively restricted, in this respect, to entries of vacant and unappropriated lands under the acts of 1777 and 1783.

By an act of Assembly of May 1780, referred to in the 7th section of the act of 1782, a certain tract of country was reserved to be appropriated to the purpose of rewarding the bravery and zeal of the Continental officers and soldiers in the service of the state of N. Carolina. By the act of 1782, c. 3. entitled, "An act for the relief of the officers and soldiers of the Continental line, and for other purposes," it is enacted that these officers and soldiers shall severally have such a number of acres of land, varying according to rank in a certain ratio specified in the act, and preliminary measures are directed to be taken for exploring and laying off the lands out of which this military bounty, or rather military debt, shall be satisfied. By the act of 1783, c. 3, entitled, "An act to amend the last mentioned act," it is declared that the persons entitled to military grants under the act referred to shall, on application to the Secretary of State, receive from him warrants of survey for such quantities of land as they are respectively entitled to " within the limits of the lands reserved for the officers and soldiers," directed to a surveyor appointed for that special purpose. No previous entry is required from a

*a* 3 *Wheat. Rep.* 221

military claimant, and the warrant of survey is restricted only by the boundaries of the territory set apart for the satisfaction of military claims. In endeavouring to pay the debt of gratitude due to her brave defenders, the State recognizes no priority of merit among them. The consideration for these grants has been received from all, and from all at the same time. There is no first or second purchaser among them, nor has there been a purchase of any particular lands, but only of specified quantities of land. To prevent disputes which might arise between two or more of them wishing to have their warrants satisfied at the same place, only two provisions are made : one that the choice shall be decided by lot, and the other, that he who has assented to his brother soldier's location, shall not afterwards interfere with it. No enactment was ever made that the warrants of survey should all be delivered at prescribed times, nor that they should be surveyed in the order of their dates or numbers, nor that grants founded on younger warrants should be void. Until the act of sess. 1. of 1784, c. 15., entitled an act to amend the act of 1782, c. 3., no mode whatever had been provided by which a memorandum of the military locations should be preserved. That act directed that the surveyor to whom the military warrants were directed should keep a book containing a minute of the name of the military claimant—number of his location—number of his warrant, of the quantity of acres, date, and description of his location. The necessity of some such memorial, as a check upon the officers of government and preven-

1822.

Blunt's
Lessee
v.
Smith.

tive of fraud, is too manifest to require any other reason to be given for this statutory provision. But to declare that because such statutory provision is made, that, *therefore*, the positive and special enactments which have been made in regard to entries in the general land office, shall obtain in these locations, and that enactments thereafter to be made, restricted in terms to the former, shall be law also in regard to the latter, may pass for any thing as well as for judicial exposition.

If, however, this Court should consider such judicial exposition as established, the inquiry then distinctly presents itself, can Tyrrel's grant claim a preference over Sumner's grant, to which it is younger, by reason of Gee's better entry ? The entry to which is allowed the extraordinary property of causing the grant subsequently issued to have legal operation from the date of the entry, is on all hands required to be a " special entry." It has been found a difficult matter to define this " specialty" with precision. The circumstances which make up this specialty are either such as are fitted to identify the entry, or to give it notoriety ; and an entry is not now acknowledged as a special entry unless notoriety and identity both concur.[a] In regard to the identity of an entry, this must depend on facts existing at the date of the entry, and appearing on its face, or to be collected by plain inference from those which do appear on its face. The *notoriety* of an entry is a different affair. Occurrences happening after an

---

a See Dallam's Lessee v. Breckenridge, *Cooke's Rep.* 157.

entry has been made may render it very notorious, although but little known before. But no subsequent occurrences can have any effect upon the identity of an entry. The entry is a matter of record accessible to every individual. It ought to be so definite, that all who are acquainted with the country may be enabled, on an examination of it, to ascertain where it lies, and to avoid interference with it.[a] No act less authentic in its nature, such as a survey —no act which is not a matter of record, however notorious it may be, is considered as giving this *legal* notification.[b] In North-Carolina and Tennessee, no record is made of surveys. The surveyor returns two platts to the Secretary's office, one of which is kept there, and the other appended to the grant. As every individual has it in his power to procure knowledge of an entry, he is presumed to have such knowledge, and if he locate land which has been before entered, he is in the condition of a purchaser with notice of a prior equitable right, affected with a legal fraud, and trustee for the equitable owner. Land titles must rest on general principles, and the entry, special on its face, and made of record, is not to be supplied by other evidence of an inferior character, but which might be thought reasonably equivalent.[c] It would be an unwarrantable, and a most alarming extension of a principle, already carried too far, to permit an entry originally wandering to be-

a Anderson v. Cannon, 1 *Cooke's Rep.* 30, 31.

b *Ib.* 32, 33.  3 *Hayw.* 186. 215. 217.  Wilson v. Mason, 1 *Cranch*, 99.

c Wilson v. Mason, *Ib.*

come fixed, originally vague to become specific, by matter *ex post facto*, and from the time of this change of character to give it the efficacy of *retracting* the grant to itself. The entry must, on its face, be fixed to some spot.[a] It is foreign from the present inquiry to examine under what circumstances a defect of notoriety in an entry, always sufficiently definite, may be remedied by subsequent occurrences, and what shall be the operation of such entry after it becomes notorious.[b]

Gee's entry is for 3,840 acres adjoining the northern boundary of " General Sumner, and running west along his line for complement." It contains no other words of description, and of course can only be identified by those. It calls for the northern boundary of General Sumner's—what? The plaintiff contends, of General Sumner's *entry*. Sumner's entry, and Gee's entry, are records of the same office, and in the same book. To this book every locator has a right to recur for the purpose of ascertaining where he may procure lands without interference with prior appropriations. A locator reads Sumner's entry, dated the 17th of March, 1785, and on the next page he meets with Gee's, dated the 1st of June, 1785, containing no other description than that it adjoins Sumner's northern boundary. It is impossible but that he should understand the latter entry as entirely depending on the former. There

*a* 1 *Tenn. Rep.* 407. 411, 412. *Id.* 505. 507.

*b* Simm's Lessee v. Dickson, 1 *Cooke's Rep.* 141. Baird v. Trimble, 1 *Cooke's Rep.* 287, 288.

is no intimation to him that a survey has been made of Sumner's entry. Calling for its *northern* boundary, and to run west along *that line* gives no such hint, for all the military entries are required "to be run out at the four cardinal points of the compass either in a square or an oblong" Act of 1784, c. 15. sec. 3. If there has been such a survey he has not the means of seeing it—is uninstructed where to look for it. He is not apprised of the names of those who made it, or from whom he may learn what lines of it were run. He must understand the reference in Gee's entry as made to that which is accessible to him—which is spread before his eyes—to General Sumner's *entry*. As the object of a special entry is to enable those who examine it to ascertain where it lies, the information which such an entry necessarily conveys to the examiner must be supposed to be the information which the enterer intended to convey. Had Sumner's entry been on its face special, and fixed to a particular spot, it is impossible to deny but that Gee's entry by these words of reference would have been equally definite and special. And if a survey had been made of Sumner's entry varying from its precise requisition, Gee's entry would still have remained fixed to the spot which the record indicated—would not have followed Sumner's survey in its wanderings, nor lost its claims to specialty and certainty.

To suppose Gee's entry to refer to the northern boundary of Sumner's survey, as ascertained by Pollock's plan and certificate, is full of difficulties. It presumes that such survey had then certainly been

made, and platt and certificate returned. It presumes that these, or some of these, were known to Gee. It presumes that this platt and certificate, and survey, were so notorious that every subsequent locator would understand words of reference in a book of *entries*, as applying not to an entry but to a *survey*. Yet there is nothing to show that this alleged survey ever became notorious, even to this day. There is nothing to prove that Gee had any knowledge of this survey, or that the platt had, at the date of his entry, found its way into the Secretary's office. Nor is there any testimony to show that any survey had then been made except the date of Pollock's certificate, a paper of very questionable character, produced under circumstances of great suspicion, and emanating from one who seems destitute of all claims to credit. The supposition that the words in Gee's entry refer to Pollock's platt takes for granted facts not proved; accordingly we find the Court instructing the jury that this platt, if Pollock marked but one line, " would show where, by calculation, the northern boundary of Sumner's tract should be according to that platt—would make Gee's entry special from the *date of Pollock's survey*, and would cause Tyrrel's grant to relate back to the *date of Gee's entry.*" Thus the Court undertook to pronounce that Gee's entry was subsequent to the marking of one of Sumner's lines by Pollock, and to the legal completion of Pollock's survey. It is not necessary, and, perhaps, it is not practicable, to clear up the mystery which Pollock's platt throws over this transaction. But it would seem probable

that Pollock, having made out a platt, presented it to his immediate principal, Malloy, and that Malloy, knowing of its interference with Lieutenant Pasteur's prior right, instead of adopting this platt as his own, made a new platt and certificate, extending the second and fourth lines sufficiently far to comprehend the twelve thousand acres exclusive of Pasteur's land. Malloy's platt and certificate were duly returned to the office, for on them the grant actually issued ; and it is likely that when he returned them he gave the information to Armstrong that Pollock was, in fact, to be credited for the work to which Malloy's name appeared, as it is otherwise unaccountable that any explanation to that effect should have been either given or required. Pollock had, no doubt, in conformity to the ordinary requisites of the law, prepared two platts. The one not delivered to Malloy afterwards found its way (at what time, or by what means, it is impossible to say) into the Secretary's office. Is it unfair to conclude that it was not there in 1793, or otherwise Sumner's grant would have conformed to it? The grossest frauds and irregularities have taken place in the Military Land Office of North Carolina. These have been proclaimed by the public statutes of the State, (*Acts* of 1797, c. 24. and 1798, c. 14.) Pollock, whose certificate has caused all this perplexity, was examined as a witness for the defendants on a former occasion, to invalidate the plaintiff's claim. He swore to the running of Sumner's second line, and the marking of the third corner agreeably to this place. Munifee proved that Pollock did not run

the second line, nor mark the third corner. All the witnesses concurred that not a marked tree was to be found after leaving Sumner's first line ; and the demonstration of nature was given to prove the false-hood of his allegation about the third corner. There was no evidence to fix the actual running of Sumner's first line more precisely than to the year 1785 or 1786. Under all these circumstances, was it not, at least, a matter of doubt whether Pollock's survey had been made—had been ratified by his superior—had been filed in the office before the 1st of June, 1785 ? And if the construction of Gee's entry, given by the Circuit Court, *presupposed* the existence of facts not ascertained, then an important inquiry was decided by the Court, which belonged exclusively to the cognisance of the jury.

If Gee's entry rests its claim to certainty upon its reference to Sumner's entry, it can advance no higher pretension than Sumner's to be regarded as a special entry. No evidence having been given of the dead-ened trees marked I. J., Sumner's entry is thus far fixed, " on the east side of the upper south road, be-tween the heads of Mill Creek, Little Harpeth, and Stewart's Creek, and on the waters *of some* of them," and Gee's is thus far fixed " to adjoin Sumner's on the north." If the first be vague, so is the second, " fixed in an orb that flies." If the first be sufficient-ly special, it will apply, as well to that part of the land covered by both grants, as to that covered by Sumner's, and not comprehended within Tyrrel's. Indeed, to have surveyed Sumner's a little further to the north and west, so as to cause it to take in

more of the land covered by Tyrrel's grant, would <span>1822.</span>
have more nearly conformed to the entry than does
the survey on which the grant has issued.

Should it be objected on the part of the defendant,
that Sumner's grant issued on a second survey after
a former survey made and returned, the objection
will avail them nothing. Where the State has au-
thorized the granting of lands, and a grant is made,
such grant, notwithstanding any irregularities, is
good against future claims.[a] A survey on which a
grant has not issued, is no estoppel to another survey.[b]
If a surveyor mistake in running out land, it is rea-
sonable that he may correct that mistake before a
grant issues, so that the rights of innocent third per-
sons be not thereby injured.[c] Unless Gee's entry is
identified to the land excluded from the first, and
comprehended within the second survey, it cannot be
pretended that Gee's rights were injured by such se-
cond survey. The survey on Gee's entry was made in
1796, ten years after the survey on which Sumner's
grant was founded, and three years after Sumner's
grant had issued; and the surveyor of Gee's entry
had with him on the survey a platt of Sumner's tract
representing the courses and distances as specified in
the platt annexed to Sumner's grant.

From some of the facts mentioned in the bill of
exceptions, it might be supposed that the parties in-
tended to raise the question of the statute of limita-
tions. It is belived, however, that is a question on

a 1 *Tenn. Rep.* 322.
b White v. Crocket, 3 *Hayw.* 183. 181.
c 1 *Tenn. Rep.* 6.

Blunt's
Lessee
v.
Smith.

1822.

Blunt's
Lessee
v.
Smith.

which this Court will not give an opinion. The statute of Westminster, the 2d, 13 *Edw.* I. *ch.* 31. which gave the remedy of a bill of exceptions, emphatically confines the attention of the Court of Errors to the exception taken, " and if the justice cannot deny his seal, they shall proceed to judgment, according to the *same exception as it ought to be allowed or disallowed.*" It does not appear that any opinion was given in the Circuit Court on the statute of limitations, or that it came into consideration there. The instruction to the jury was founded solely on the supposed relation of Tyrrel's grant to the date of Gee's entry, so as to overreach Sumner's prior grant. A bill of exceptions does not draw the whole matter into examination, but only the points to which it is taken, and of course must be regarded as stating such facts only as will enable the revising Court to judge of the matter excepted to.[a] It may not be amiss however, to state, that on this question as presented by the facts appearing on the bill of exceptions, the plaintiff claims to be entitled to recover. The Tennessee adjudications have settled that persons " beyond seas," have eight years after returning to the State, within which to make their entry, or bring their writ;[b] and this Court has decided that the words " beyond seas," are equivalent to " without the limits of the State."[c] In this case it is explicitly stated that the lessor of the plaintiff never was within the limits of the State of Tennessee.

a Bridgman & Holt, *Show. Parl. Cases,* 120. *Bull,* N. P. 316. Frier v. Jackson, 8 *Johns. Rep.* 495.

b 2 *Tenn. Rep.* 341.

c Murray v. Baker, 3 *Wheat. Rep.* 541.

Mr. *White*, for the defendants in error, stated that before a discussion of the main question presented by this record, the attention of the Court ought to be directed to the only bill of exceptions which was either tendered in, or signed by the Circuit Court. By that it would appear, that no exception whatever was taken to the instructions given to the jury, at any time *before* the *verdict* was rendered. If the plaintiff was dissatisfied with the charge, that dissatisfaction ought to have been expressed immediately ; remaining silent until the rendition of the verdict was a waiver of any exception, which might have availed the party if it had been taken immediately.[a] The first error assigned, as to the charge, is upon a motion for a new trial, after the refusal of which, the bill of exceptions was tendered and signed. Whether the Court decided correctly or not in refusing the new trial, is a point which this Court will not revise, as has been so well settled, that it would only be a waste of time to refer to decisions in support of this statement.

If these preliminary objections are well taken, there is no point brought here, for examination, which can admit of any doubt.

It is to be regretted, that, from the bill of exceptions, we are not at liberty to examine the question, relative to the statute of limitations. It is sufficient to say that only one opinion could be entertained upon it, if it was fairly discussed.

But as it is possible that we may be mistaken in

a *Bull. N. P.* 115.

supposing that the charge of the judge below is not now before this Court. Should that be the case, it is submitted that the charge was strictly correct. The line E. F., represented on platt No. 3. must be considered as between these parties the *northern* boundary of *Sumner*: (1.) Because the proof shows satisfactorily, that in May, 1785, Sumner caused his entry to be surveyed by Pollock: that the corner at A. was made, the lines A. B. and B. E. were then run, and these three corners marked. A platt and certificate of this survey was made, and with the warrant, returned to the Secretary's office. The moment these things were done, the surveyor was, as to this transaction, *functus officio*, the boundaries of Sumner's 12,000 acres were fixed, and he who then made an entry, calling to adjoin him on the north, can never be disturbed by any after act of others, changing Sumner's boundary. The defendant's entry was made on the first day of June, 1785, and his grant is to be viewed as if issued on that day because the entry on which it it issued is special.

The plaintiff is not now at liberty to say, the fact is not as I have stated; although there is a contrariety of evidence upon the fact, whether the line B. E. was run by Pollock, yet as the plaintiff excepted to the charge, the fact is to be taken most strongly against him.[a] But if this be not so, still it is insisted that no man can doubt the running the line A. B. and marking those two corners by Pollock, an authorized surveyor, in May 1785. This line is now, and

*a Bull. N. P.* 117.

1822.

Blunt's
Lessee
v.
Smith.

nas at all times been, the southern boundary of Sumner's tract. It is therefore contended, (2.) That on the 1st of June, 1785, when the entry of Gee was made, he had a right to include in it any land which Sumner's entry did not notify him was included within Sumner's claim. Of what then was Sumner's entry notice? That Sumner had appropriated 12,000 acres which was to run north from B. as many poles as would make that quantity, and nothing more. This will stop us at E. and still make E. F. the northern boundary, which Gee *calls to adjoin.* The officers and soldiers had equal rights: they had each paid the same kind of consideration, and each had a right to appropriate to his own use any vacant land he could find, within the military district; and all was vacant, except that which had been either granted, or so described in an entry, as to afford reasonable notice, to all others, of the spot appropriated by such entry. On the 1st of June, 1785, when Gee entered, how could he know that Sumner's boundary would be changed by extending the line from B. so as to include 14,000 acres of land, when his entry called for 12,000 only? It was impossible. Yield to the pretensions on the other side, and suppose the facts to be, as we may well suppose it, that there was a succession of entries, each calling to bound upon the north of the other, and look at the consequences. By changing Sumner's northern boundary, you change the northern boundary of each succeeding entry, and by this means there is an exchange of tracts to the northern boundary of the State, and the last is pressed into the adjoining State.

The position is too mischievous to be well founded.

But it has been argued that the decisions in Tennessee, which authorize an entry to be noticed as evidence in a Court of law, are founded in error, and ought not to be extended.

To those who have no knowledge of the peculiar situation of Tennessee, when North Carolina legislated upon this subject, there is plausibility in this argument : but when the situation of that country is understood, and the statutes relative to this point considered, it is believed, there can be found no ground of doubt upon the subject. It has been often examined, and for many years the point has not only been considered as decided, but decided so often, that it is *settled*, and settled upon principles which every one will believe correct, who will take the trouble to examine them.

It has been further argued, that if the defendants are permitted to introduce their entry in this case it will be going farther than has been done in Tennessee.

The counsel who use this argument have not examined this subject with their usual correctness. The principle settled in every case is, that either party, plaintiff or defendant, may introduce his entry, and if that entry is special, and so describes the land afterwards granted to the enterer, that his title shall be considered, as if this grant had issued on the day his entry was made.

It has likewise been insisted, that there is very little pretence for putting grants founded upon military warrants upon the same footing with those bot-

tomed on entries made under the acts of 1777 and 1783.

1822.

Blunt's
Lessee
v.
Smith.

But the Courts have made no distinction, nor ought they to make any, that could benefit the plaintiff. If any distinction can be found, it is that there is more reason for receiving the entry in the former case than the latter. In the latter, the entry office was in N. Carolina, remote from the land to be entered. In the former the office directed to be kept at Nashville, in the military district; to the end that the officers and soldiers might conveniently examine it, and become informed of previous appropriations. Upon inspecting this record, and the facts there disclosed, it must be manifest that Sumner's boundary is the line E. F. If not, how came the plaintiff by the certificate for 1808 acres of land, on account of the interference with Pasteur's? It could not have been procured, because there would have been 12,000 acres exclusive of Pasteurs's claim, and no certificate could have been procured. There is, therefore, the representation to the General Assembly of N. Carolina, the application to the Board of Commissioners, the testimony of many respectable witnesses, and the persuasive evidence furnished by the verdicts of three different juries, all concurring in the fact that the line E. F. is Sumner's northern boundary. Why should it be disturbed? The plaintiff now holds within that line about 11,000 acres of land, and has a land warrant, or certificate for 1808 acres in compensation for that taken by Pasteur, making in all about 13,000 and that without interfering with the defendants. They ought not to be disturbed, and

the more especially as the record shows, that many persons are now dead, who formerly gave material evidence, and upon whose evidence the two first verdicts were founded.

*March 5th.*

Mr. Chief Justice MARSHALL delivered the opinion of the Court.

This is a writ of error to a judgment in ejectment rendered in the Circuit Court of the United States for the District of West Tennessee, which was brought by the plaintiffs in error. After a verdict in favor of the defendants, the counsel for the plaintiff moved for a new trial, which was refused. To the opinion of the judge, overruling the motion for a new trial, and also to his charge to the jury, the plaintiff excepted, and the cause comes on now to be heard on his exceptions

It is well settled that this Court will not revise the opinion of a Circuit Court, either granting or rejecting a motion for a new trial; but the exception to the charge of the judge, although taken after a motion for a new trial, may have been and probably was reserved at the time the charge was given, and will therefore be considered.

The exception to this charge of the Court below, consists of two parts:

1st. To so much of it as admits the copies taken from the Secretary's office of North Carolina, as evidence in the cause.

2d. To so much of it as admits the validity of Gee's entry, and gives it the preference to so much of Sumner's patent as comprehends land not embraced in Pollock's survey.

The first point seems not to have been relied on by the plaintiff's counsel in argument; and has, we think, been very properly abandoned. These documents were official copies of papers belonging to the title of the parties, taken from the office in which those papers were kept, and regularly authenticated. We perceive no ground on which the objections to their admission could be sustained. If the charge of the judge went beyond these official copies to the proceedings of the legislature, and the record of the former trial, we perceive no error in this. The former trial was between parties or privies, and the petition to the legislature was the act of the party by guardian, the resolution of the General Assembly on which, was a measure of the whole State, the effect of which in this or any other case, might be controverted, but to which all interested in it might have recourse.

The second part of the charge presents a question of more intricacy, which requires an attentive consideration of the land laws of North Carolina, and of the decisions of the Courts of Tennessee.

In Kentucky and in Virginia the rule is, that a Court of common law cannot look beyond the patent; but in Tennessee it is understood to be otherwise. The Courts of law in that state allow the parties, in an ejectment, to go back to the original entry, and to connect the patent with it. This rule is founded on the land laws of North Carolina, which have been construed in Tennessee to permit and require it. But the plaintiffs contend that this construction has been limited to the comparison of the

1822.

Blunt's
Lessee
v.
Smith.

dates of the entries, and admits of no inquiry into their legal effect as they stand in relation to each other.

If the question were to depend merely on its reason, it would be difficult to support the opinion that a Court authorized to compare entries with each other, should not, in the exercise of this power, be permitted to examine their whole legal operation and relative effect. If it were to depend upon a construction now, for the first time, to be given to the acts of North Carolina, we should find great difficulty in maintaining that they allow the entries to be compared so far as respects dates, but no farther. The act of November, 1786, ch. 20, in its preamble, recites, that " Whereas it is the intent and meaning of the said act," (the act for opening the land-office,) "and of the act hereby revived and put in force, that the first enterers of the vacant and unappropriated lands, *if specially located*, therein described, shall have preference of all others," &c. The 1st section then enacts, " That every first enterer of any tract of land, specially located, lying in the western parts of this state," &c. shall have a further time for making his surveys, and that grants upon lands previously entered by any other person shall be void.

The same act allows a survey to be made on removed warrants, in cases where the warrants were originally located on lands which had been previously entered " as the law directs," by some other person, " provided such lands were at the time of such survey actually vacant, and that such survey on removed warrants shall not affect or injure the right of

any lands entered, and *specially located*, in the office aforesaid previous to such survey."

The act of November, 1787, ch. 23, directs all surveyors to survey lands according to their priority of entry, and that every grant obtained on a subsequent entry, contrary to the provisions of that act, shall be void.

The original act had prescribed the manner of making entries, and those made in pursuance of law are considered special.

Between special entries the first is undoubtedly to be preferred; but if one entry be special and the other vague, as if one should describe the land intended to be acquired, in conformity with the act, and the other should totally omit to give a description which might designate the place, should enter 5,000 acres of land, lying in the county of A. without naming any place in the county to which it might be fixed, could it be contended that, on any fair construction of the acts, this entry would prevail against one which was special, but was subsequently made? We think it could not. The acts of North Carolina appear to us to have been intended to preserve the priority of legal entries, not of those made contrary to law.

We do not think that the decisions of the Courts of Tennessee establish a contrary principle. Several dicta are to be found in the cases stating the rule to be, that Courts will go beyond the grant only to support a prior entry, but these dicta were applied to the exclusion of extrinsic matter, not to the exclusion of considerations belonging to the entries themselves.

The title to lands surveyed on removed warrants, has never been carried back to the entry ; and on the same principle the title to lands surveyed off the entry, can have no date anterior to the patent, so far as the survey does not conform to the entry. (1 *Tenn. Rep.* 172. 351. 306. 413.)

The effects of entries, then, as well as their dates, is considered by the Courts of Tennessee.

It has also been contended that this principle ought not to be applied to military grants. The acts of North Carolina, which have been construed to justify a Court of law in considering the entry as the commencement of title, are not, it is agreed, applicable to military warrants. But the act of 1786, c. 20. on which this construction is supposed to be founded, declares it to have been the intention of the act for opening the land office, that the first enterers " shall have preference to all others in surveying and obtaining grants for the same."

We think the act which prescribes the mode of obtaining military grants manifests this intention as unequivocally as those which are referred to in the act of 1786, c. 20. It is true, as has been stated in argument by the plaintiff's counsel, that the 3d sec. of the act " for the relief of the officers and soldiers of the Continental line, and for other purposes," directs, that where two or more persons wish or claim to have his or their warrant located on the same piece of land, the parties contending shall cast lots for the choice. But this section obviously provides for applications made at the same time. The 5th section directs, that " where a warrant shall be hereafter located, with-

out any person making objections to such location, that such location shall be good and valid, notwithstanding the claim that may be afterwards set up by any other person."

This section, we think, manifests a clear intention to give priority of right to the prior entry ; and we are not surprised that, under this act, the Courts of Tennessee should comprehend military titles also in that rule which authorizes Courts of law to take into view the entries of the parties. At any rate, such is the settled course of the Courts of the State, and those of the United States ought to conform to it.

We think, then, that the Circuit Court committed no error in inquiring into the rights of the parties to the land in controversy, under their respective entries. It is next to be considered, whether, in making this inquiry, that Court has decided erroneously.

The entry, as well as the patent of the plaintiff, being the oldest, it must prevail unless some circumstance has occurred to defeat the right given by this priority.

The defendants rely upon the survey made by Pollock as confining the entry of Sumner to that survey.

Of the existence of this survey there appears to have been no doubt, and none seems to have been entertained at the trial. The plaintiff objected to receiving the copy of the platt and certificate in evidence ; but, when that objection was overruled, he contested the survey no farther. His object, then, was to show, that the second line was never run.

The Judge charged the jury, that the platt and certificate made by Pollock, if he marked no more of the corners and lines of Sumner's tract, but the southern boundary, and south-east and south-west corner would show, by calculation, where the northern boundary of his tract should be.

Nothing can be more apparent than the correctness of this charge. The law directs, that " every tract surveyed for officers or soldiers, shall be run out at the four cardinal points of the compass, either in a square or in an oblong." Consequently, when one line of a survey is given, the remaining three lines are found by a calculation which cannot vary. General Sumner's entry was for 12,000 acres of land. A line from west to east, constituting the southern boundary, was run, and measured 1,292 poles. Corner trees at each extremity were marked. From the end of this first line the survey calls for a line due north 1,486 poles. Had this line been actually run and marked, the tract would have been bounded by the lines actually run, and the corner trees actually marked. But, the line not having been run, the tract was bounded by the course and distance called for. Had there been no survey, had Sumner's entry been for 12,000 acres of land, to begin where the survey began, and to run east 1,292 poles, and from the ends of that line north for quantity, it must have been bounded in the same manner, because, a rectangular oblong figure, to contain 12,000 acres, one of which is 1,272 poles, must have for its other sides, lines of 1,486 poles. Of course the Judge was correct in saying, that if the southern

boundary was given, the northern boundary was to be found by computation.

Was he equally correct in adding, that Gee's land might be located on the north of Sumner's northern line when thus found?

We think he was.

Gee's entry called to lie, " adjoining the northern boundary of B. General Sumner, running west along his line for complement."

Sumner's northern line was, consequently, Gee's southern line.

If, then, Sumner's grant had been issued according to Pollock's survey, no interference between him and Gee could have taken place. But a platt and certificate of survey was afterwards made out by Malloy, who was also a deputy surveyor, which extended the lines constituting the eastern and western boundary of Sumner's land, to 1,737 poles; and upon this platt and certificate his patent was issued. We must, therefore, inquire whether Pollock's survey was legally made; and, if it was, whether it could be afterwards changed, so as to effect a person making an entry in the intermediate time between his first and second survey.

The laws of North Carolina make it the duty of surveyors to survey entries in the order in which they are made, and do not require the presence or direction of the owners of the land. Pollock was a deputy surveyor authorized to make this survey. Consequently, it was regularly made, and had all the consequences of a legal survey.

Admitting the alteration made by Malloy to be

perfectly justifiable, Gee's entry was prior to that alteration ; and the question is, whether such alteration can affect an appropriation previously made?

Upon the principles of reason and common justice, we could feel no difficulty on this point.  But we are relieved from considering it by the decisions which have already taken place in Tennessee.  In *Blakemore* v. *Chambles,* (1 *Tenn. Rep. 3.*) it was expressly determined, that the validity of surveys " has no dependence on the will or direction of claimants," and that though the mistakes of surveyors may be corrected, " they cannot be so corrected as to injure a subsequent adjoining enterer."

Gee's entry, then, made after Pollock's survey, will, if a valid entry, hold the lands against any subsequent survey made for Sumner.  But as Sumner's is the eldest grant, the validity of Gee's entry must be examined.

It calls to adjoin Sumner's northern boundary, and to run west along his line for complement.

The laws of North Carolina direct, that an entry shall express " the nearest water courses, and remarkable places, and such water courses, lakes, and ponds as may be therein, the natural boundaries and lines of any other person or persons, if any, which divide it from other lands."

This law cannot be construed, and never has been construed, to require that water courses, or remarkable places which are remote, should be expressed in the entry.  It requires the expression of those only which are contiguous, and which may assist in show-

ing the land intended to be acquired. If there be no considerable water courses, lakes, or ponds within it, the entry cannot express them. The reference to the adjoining land, when we take into view that the law directs entries to be surveyed according to their dates, would always be sufficient to make the entry special, if the line called for could be found In *Smith and others v. Craig's Lessee,*(2 *Tenn. Rep.* 296.) the Court said, " Previously to the year 1786, a vague entry was well understood to be one that contained no such specialty as that a majority of those acquainted in its neighbourhood, at its date, could by reasonable industry, find it ; a special entry was considered the reverse. How natural is it, then, for us to suppose, that the legislature designed, in the use of this expression, in the act of 1786, to convey such ideas as had by usage and common consent been appropriated to it."

The books are full of cases containing similar expressions. It is impossible to look at all into the subject, without being satisfied that in the State of Tennessee, such an entry as that of Gee would be deemed special, if Sumner's northern boundary could be found.

There could be no difficulty in finding it, since his land had been surveyed when this entry was made.

But the great objection on which the plaintiffs most rely, is, that to constitute a special entry in the state of Tennessee, the objects called for must be notorious as well as certain. The entry must be such as to give general information of the precise land it appropriates. Notoriety, as well as identity, are es-

sential, it is said, to specialty, and a call for Sumner's line is not good, unless Sumner's survey was notorious.

If this proposition be correct, if notoriety as well as identity be essential to the validity of an entry in Tennessee as it is in Kentucky, then Gee's entry cannot be sustained. But the law of Tennessee is, in this respect, entirely different from that of Kentucky. The act of Virginia, which is the land law of Kentucky, requires, that entries shall be so special and certain that any subsequent locater may know how to appropriate the adjacent residuum. The land law of North Carolina, which is the law of Tennessee, contains no such provision. The lawyers of Kentucky have made some attempts to transplant into Tennessee the principles which had grown up in Kentucky; but their attempts were unsuccessful. The books are full of cases in which it is expressly decided that notoriety is not essential to the validity of an entry. In the case of *Philip's Lessee v. Robertson,* (2 *Tenn. Rep.* 399.) the whole subject is reviewed. Judge Overton takes a very comprehensive view of the doctrines growing out of the land laws of North Carolina, and shows conclusively that they do not require, and had never been understood in Tennessee to require notoriety, as essential to the validity of an entry. His opinion in this case has, we are informed, been confirmed by the other judges of their Supreme Court.

If notoriety be not necessary to Gee's entry, it is special according to the laws of Tennessee, and ought to hold the land it covers against any subsequent sur-

vey made of an entry which had been previously sur-

veyed. The judge was correct in saying that such

subsequent survey must be considered as if made on
a removed warrant.

Judgment affirmed with costs.