DANIEL, J.
The legislative provision, on the proper construction of which the questions raised in this case mainly turn, will be found in chapters 38 and 96 of the Code of 1849.
The third section of the first mentioned chapter, p. 443-4 of the Code, provides that for a license to keep a house of entertainment the application shall be, when the house is in a town having a corporation court, to such court, and when it is not in any such town, to the court of the county wherein it is. If the court be of opinion that the applicant is sober and of good character, and will probably keep a house orderly, useful and such as the law requires, it may *grant such license; and if the house be in a town, the court, when it grants the same, may, if the applicant desire it, dispense with the necessity of his providing for horses. If such application be refused, the refusal shall be entered of record; and a license shall not be granted to the applicant before the next May term, unless by a court composed of the justices to whom the first application was made, or a majority of the acting justices of the county or corporation.
The fourth section of chapter 38, p. 207 of the Code, provides, that no person shall, without license, keep either an ordinary, house of private entertainment or bowling saloon or alley. And the eighil section of the same chapter provides, that the receipt for the tax on such license as is mentioned in fhe fourth section, shall be produced to the court to which application is made for the license, before such application is considered. If the court reject the application, the tax shall be refunded to the person who paid it.
On the one hand it was insisted at the bar, that the terms “may grant such license,’’ are either absolute^ imperative, making it the duty of the County court to grant the license whenever the applicant produces the receipt of the proper officer for the tax imposed on such license, and brings himself within the requirements of the fourth section of the first mentioned chapter, or indicative of a purpose to enjoin a duty which is to be performed with discretion ; a *343 sound discretion, having a regard to public convenience, and looking to the objects contemplated by the act; and that the action of the justices in refusing to grant a license, may be revised and controlled in a superior court by means of a mandamus.
On the other hand it was insisted, that the word “may” is used in the statute in its popular sense. That it is permissive, and is employed to grant an authority coupled with a discretion, which latter, *from its very nature, does not admit of its being guided or superseded by the orders of any superior or appellate tribunal.
In considering these opposing views we may, I think, be greatly aided by a reference to previous legislation on the subject.
The fourth section of the act of 1705, 3 Hen. St. 376, after declaring that whosoever shall retail liquors in their houses without license first had and obtained, shall forfeit and pay a fine of two thousand pounds of tobacco, provides, that “any one intending to set up an ordinary or house of public entertainment, shall petition the county court; and they, by their discretion, shall judge whether it is convenient to suffer such a house to be set up; and whether the person petitioning be of ability sufficient to comply with the intent of the law in providing convenient lodging and diet,” &c. The section then proceeds further to provide, that on “said petition being approved,” the court shall take bond of the petitioner, with good and sufficient security, with condition to find and provide, constantly, good, wholesome and cleanly lodging and diet for travelers, and stablage, provender, &c., for horses: And that “the bond and security being thus taken, the court may grant their order," &c.
The act" of 1748, ? 1, 6 Hen. St. p. 71-2, after declaring that every person intending to keep an ordinary, shall first petition the County court, proceeds, “And the justices of the court to whom such petition shall be exhibited, shall thereupon consider the convenience of the place proposed, and the ability of the petitioner to keep good and sufficient houses, lodging and entertainment for travellers, their servants and horses,” &c. “And if such petition shall appear reasonable, such court is hereby authorized, and may, if they think fit, grant the petitioner a license to keep an '^ordinary for the term of one year next ensuing the date of such license, and from thence till the next court held for the same county, and no longer; which license shall be signed by the first justice sworn in the commission of the peace for such county; and may, upon petition, be renewed from year to year, if the court shall think fit.
The first of the above recited acts, as we have seen, commits, in terms, the granting of such licenses to the discretion, judgment and approval of the justices. And though the words of the act of 1748 are not exactly the same, they are not less expressive of a purpose to confer authority on the justices to consider and act in the matter, free from all control other than the dictates of their own judgment.
The language used in the act of 1792, in reference to the grant of the license, is identical with that employed in the act of 1748. The act of 1819 provides that every person intending to set up an ordinary or house of public entertainment, shall first petition the court of the county or corporation wherein such ordinary is intended be, and obtain a license for keeping the same; and the justices of the court to whom such petition shall be exhibited, shall thereupon consider the convenience of the place proposed, the character of the petitioner for good order, sobriety and honesty, and his ability to keep good and sufficient houses, &c. ; and if such petition shall appear reasonable, and the court shall be satisfied and enter of record that the petitioner is a man of good character, not addicted to drunkenness or gaming, and shall be of opinion that he will keep an orderly and useful house of entertainment, they shall be and are hereby authorized to grant to such petitioner a license to keep an ordinary.”'— “Upon like petition and like entry on record, the license may be renewed from year to year, as long as the court shall be of opinion that the petitioner hath preserved his *good character, and continues to keep an orderly and useful house of entertainment,” &c. 2 Rev. Code, ch. 240, § 1.
The same language is employed in the act of 1840. See ch. 21, sec. 13, Sess. Acts 1839-40.
It is obvious, I think, that there is no such variance in the provisions of these two last mentioned acts, from those found in the preceding acts we have cited, as would denote any change in the policy of the legislature.
Is anything to be found in the 3rd section of chapter 38 of the Code of 1849, from which to infer such a change of policy? It is true that the said section does not, in terms, require the court to consider “the convenience of the place proposed.” But are we to infer, from the absence of these terms, a purpose on the part of the legislature to enjoin it as a duty on the justices to grant a license to every applicant who proves that he is sober and of good character, and will probably keep an orderly house, furnished and provided with the accommodations for travelers, servants, &c., required by the fourth section? Are all considerations of the convenience of the place proposed to be discarded? This would be to treat the word “useful,” employed in the section, as of no importance, and to compel the County court to disregard a matter about which the law says they must be satisfied before they have any authority to grant the license. The probable utility of the house must depend not only on the character and conduct of the person who is to keep it, and on its being managed and kept in an orderly manner, and provided with the necessary diet, lodging, &c., but also on “the convenience *344 of the place proposed,” the number of such houses already established at or near such place, and on a variety of other considerations, which will readily suggest themselves to the mind. And I apprehend that *the right of the court to examine and weigh such considerations, in forming an opinion as to whether the applicant will probably keep a “useful” house, is just as clearly conferred as if given in express terms.
And when we look into the history of our legislation on this subject, instead of finding there anything from which to infer that the unjust or improper withholding by the justices of such licenses from the citizens applying for them, was an evil to be apprehended and guarded against, we shall find that convictions of the existence of present evil and fears of future mischief entertained by the legislature, were the result of views and considerations of a directly opposite nature. .
An illustration of this is to be found in the act of 1666, 2 Hen. St. 286. The preamble recites, that ‘ ‘the excessive number of ordinaryes and tipling-houses set up for the advance of private gaine, had been found full of mischiefe and inconvenience,” &c. And the act then proceeds to declare, ‘ ‘that the commissioners of each County court be required to take special! care for the suppressing and restraint of the exhorbitant number of ordinaryes and tiplinghouses in their respective counties, and not to permití in any county more than one or two, and those near the court-house, and noe more unles in publique places, as ports, fferryes, and great roades, where they may be necessary for the accommodation of travellers, according as the said courts shall find the necessityes of their counties require,” &c.
And so again: The act of 1676, 2 Hen. St. 361, after reciting that “it is most apparently found that the many ordinaries in severall parts of the country are very prejudicial!, and this assembly finde the same to be a generall grievance presented frome most of the counties,” proceeds to enact, that “no ordinaries, ale-houses or other tipling-houses whatever, by any of *the inhabitants of this country, be kept in any part of the country, except it bee in James City, and at each side of Yorke river, at the two great ferries of that river; provided, and it is hereby intended, that those at the ferries of Yorke river as aforesaid, be admitted in their said ordinaries to sell and utter man’s meate, horse meate, beer and syder, and no other strong drink whatsoever; and that all other ordinaries, ale-houses and tipling-houses whatsoever, in the country (except as before excepted), be utterly suppressed,” &c.
Numerous other instances of the like kind might be cited; and in nearly every law on the subject, if we do not find a preamble setting forth the existence of pernicious and hurtful consequences growing out of the multiplicity of such houses, and declaring the earnest desire of the legislature to guard against the evil, we shall find restriction after restriction on the authority given to the justices, showing manifestly, that the legislature had fears, not that the rights of applicants, or the convenience of the public, might suffer from a failure of the courts to allow the setting up and keeping of a sufficient number of such houses, but that the morals of the people might sustain injury from the granting of too many licenses.
It is difficult to conceive why the legislature of 1849, with a knowledge of the policy which thus marks our previous legislation in conferring power on the justices over the subject of granting licenses, should have employed terms, which, in common acceptation, are permissive and not mandatory, and which, in former laws, have been used in the first mentioned sense, if they did not mean to confide such authority to the discretion of the justices.
I can discover in the act of 1849 no indication of a change of legislative purpose; nothing to show that the fitness, propriety and reasonableness of all applications *for such licenses, are not still left to the consideration, discretion and judgment of the justices, as fully as by former laws.
With this view of the nature of the authority- given to the County courts, I cannot see how, when they have heard an application, and, in the exercise of their discretion, have pronounced a judgment of refusal against it, the superior court can undertake to revise the judgment by means of a mandamus, without running counter to the law of the subject, as settled by numerous decisions of the courts, as well in England as in this country.
The principle on which the superior courts act, and the extent to which they go in controlling by mandamus the action of the inferior courts, in cases where the latter are authorized to act in matters of discretion, is concisely and clearly stated by the judges in the case of The King v. Justices of Kent, 14 East’s R. 395. It appears from the statement of facts, that the justices were authorized by statute to fix the rate of wages of certain classes of laborers therein mentioned ; and they refused to hear an application made by a number of persons, representing themselves to be millers, and asking the court to fix the rate of wages, on the ground that, according to a proper construction of the statute, the court had no authority to act, except on the application of servants employed in husbandry. The mandamus in that case was allowed, but with the following declaration of their opinions by the several judges:
Eord Ellenborough: “We do not, by granting this mandamus, at all interfere with the exercise of that discretion which the legislature meant to confide to the justices of the peace in session: We only say they have a discretion to exercise; and therefore they must hear the application; but having heard it, it - rests entirely *345 *with them to act, or not, upon it, as they think fit.”
L/C Blanc, J. : “We only say that the justices have authority to act upon the subject matter of the application; and that they are to hear it, and then determine whether, in their discretion, they think proper to fix a rate of wages.”
Bayley, J. : “We tell the justices that they are authorized by law to settle a rate of wages for the persons applying; but we do not say thej' are to exercise that authority in this instance.” So in the case of Ex parte Nelson, 1 Cow. R. 419, the Supreme court of New York declared the doctrine to be, that when a discretion is vested in any inferior jurisdiction, and that discretion has been exercised, a mandamus cannot issue ; that the superior court cannot control and ought not to coerce that discretion. The same principle is asserted in the case of Ex parte Benson, 7 Cow. R. 363, and in the case of Gunn’s adm’r v. the County of Pulaski, 3 Pike (Ark. R.) 427. And in Pickett’s Case, Spencer’s N. Jer. R. 134, the court say they never direct in what manner the discretion of an inferior tribunal shall be exercised, though in a proper case they would require such tribunal to proceed to a decision, to the end that said decision may be reviewed in due course of law. And in two cases in 3 Texas R. 51, 88, the rule is stated to be, that the writ will not issue unless to control the performance of an act clearly defined and enjoined by the law, and which is therefore ministerial, and neither involves discretion nor leaves any alternative. In the cases in 1 Alab. R. 15, 1 Morriss Iowa R. 31, and 25 Maine R. 296, the same principle is declared.
Other cases of the like character might be referred to, but I deem it unnecessary to cite them, in as much as there are numerous decisions having a more immediate ‘^bearing on the question we are considering. Thus, in the case of Rex v. Young & Pitts, 1 Burr. R. 556, which was the case of a motion for an information against justices of the peace for arbitrarily, obstinately and unreasonably refusing to grant a license to keep an inn, the doctrine is thus concisely and strongly' stated by Eord Mansfield: “This court has no power or claim to review the reasons of justices of the peace upon which they form their judgment in granting licenses, by way of appeal from their judgment, or overruling the discretion entrusted to them. But if it clearly appears that the justices have been partially, maliciously or corruptly influenced in the exercise of this discretion, and have consequently abused the trust reposed in them, they are liable to prosecution by indictment or information; or even possibly by action, if the malice be very gross and injurious.” He had previously declared, in the progress of the argument or the motion, that the argument ought to be “taken up upon the foot of criminality in the justices.”—-“For there was no pretence upon any other foot, to make a rule upon the justices, who have a discretionary jurisdiction given them by the law.” Mr. Justice Denison also expressly “ allowed the discretionary power of the justices in granting licenses without appeal from their judgments, or having their just and honest reasons reviewed by any body.” He then proceeded to express the opinion, that in cases of clear and apparent partiality or willful misbehavior, they might be proceeded against by way of information. The other judges expressed themselves to the same effect.
The same principles were announced in the cases of Rex v. Davis & Williams, 3 Burr. R. 1317, and Rex v. Baylis, Id. 1318; both of which were also cases of motion for information against the justices for refusing to grant licenses. In the first of these cases (in which *the information was granted), Eord Mansfield emphatically 'declared that the court granted the information against the justices, not for the mere refusing to grant the licenses, which he said they had a discretion to grant or refuse as they should see to be right or proper, but for the corrupt motive of such refusal.
And in the case of John Giles, 2 Strange’s R. 881, in which a motion was made for a mandamus to the justices of Worcester to grant a license to Gthes to keep an ale-house, the motion was overruled, with the brief declaration by the court, “There never was an instance of such a mandamus, and therefore we will not grant it.”
The question has been presented in the same shape to the supreme courts of several of our sister states, and has, so far as we can find from reports of their decisions, been uniformly decided by them in the same way.
In the case of The People v. Norton & others, 7 Barb. R. 479, we find the singular instance of an indictment against commissioners of excise for improperlyand corruptly granting such a license ; and in that case the Supreme court of New York say, that “The justices, in granting or refusing licenses under the excise law, do not act solely as judicial officers. They have indeed a discretion, to exercise which this court will not control by mandamus. But their duties are so plainty defined, that if thej'disregard them, they are liable to an indictment.”— “The duty of commissioners of excise in this state is extremely similar to that of justices of the peace in England in granting or refusing licenses to sell ale. The conduct of justices in that respect has frequently been the subject of investigation; and it seems to be clear, says Mr. Russell, that though upon this matter they have a discretionary jurisdiction given them by the law, and though discretion means the exercising the best of their judgment upon the occasion *that calls for it, yet if this discretion is willfully abused, it is criminal, and under the control of the Court of king’s bench.
And. in the case Ex parte Pierson, 1 Hill’s N. Y. R. 665, the question as to the power of the superior courts to interfere by man- *346 damns, was distinctly presented on an application for a mandamus to the commissioners of excise to compel them to grant to Pierson a license to keep a tavern. The court refused the mandamus, stating that the law conferred upon the justices a large discretion, the exercise of which, either in granting or refusing a license, could not be coerced in any way.
The case of The Attorney General v. The Justices of Guilford County, 5 Ired. R. 315, is one having a still closer resemblance to the one before us. There the policy of such laws, the power and duties of the justices in administering them, and the extent to which their action is subject to the control of the superior courts, is discussed by Chief Justice Ruffin with great fullness, learning and ability; and the conclusion to which he came, and in which he was sustained by all the judges, were, that whilst the justices might be proceeded against by way of information or indictment for a corrupt exercise of their powers, they could in no case be coerced by mandamus to grant a license. In that case the question was fully presented, and seems to have been conducted with the view of fairly testing whether in any case the mandamus could go. The justices, in their return to the writ, admitted that the applicant had proved himself to be possessed of all the qualifications which the law required, and stated that at a court previous to the one at which the application was made, the justices, a majority being present, had resolved that thereafter no license should be granted to any person, as they entertained the opinion that the retailing of *spirituous liquors was against the public policy and a hurt to the morals of the people, &c. And though the relator had shown himself to be a man of good moral character, yet they thought the business of retailing would of itself be, in that place (the town of Greensborough),. productive of evil consequences; and they insisted that, by the law, the granting of orders for such licenses or refusing them, was a matter entirely in the discretion and free choice of the justices; and submitted whether th'ey could be compelled by mandamus to grant the license, &c.
It is true that the application in that case was for a license to retail liquors; but it will be seen that, in the opinion of the chief justice, he places such an application under the laws of North Carolina, on the same footing with one for license to keep a tavern. And it will also be seen from his statement of the provisions of the statute in respect to such last mentioned licenses, that it is very similar to our own. The decision is, therefore, directly in point; and the opinion by which it is sustained is, I think, entitled to great respect as well on account of its intrinsic force as of the well known worth and ability of the learned-judge who pronounced it.
The same doctrine is maintained by the Supreme court of Georgia, in the case of Manor v. McCall, 5 Georgia R. 524. The court say that the doctrine as to discretion is well defined, and seems to be this: A superior court will not undertake to regulate and control a discretion in the inferior judiciary, which is not and cannot be governed by any fixed principle or rule; and after citing other instances, the court proceeded: “So in the granting of licenses, roads, &c.”—“In this class of cases the inferior courts will be required to act; but they will not be coerced as to the mode or manner of their action.”
The counsel for the petitioner referred us to a recent *decision of the Supreme court of Kentucky, which he supposed to be the other way. I understood him to say that he had not seen the report of the case, but that it would be found in 14 B. Monroe, and that he had been informed by members of the bar who had seen it, that it sustained the right of the superior courts to control the action of the justices in the matter of granting licenses to keep ordinaries, &c. The case to which I suppose the counsel intended to refer us, is that of Dougherty v. Commonwealth, 14 B. Monr. R. 237, as it is the only case on matters of this kind which I can find in the report mentioned. It is true that in that case the Supreme court of Kentucky did reverse a decision of a Superior court, declining to review and control(the action of the County court in refusing to grant a license. But the application in that case was not for a license to keep a house of public entertainment, but was-an application by a merchant for a license to retail liquor. And the case was brought to the superior court not by mandamus, but by writ of error.
Booking to the grounds on which the Supreme court rests its reversal of the judgment of the superior court, I think that the case, so far from deciding anything in opposition to the views I have endeavored to maintain, is a strong one in support of them. This will be shown more readily and clearly by a few extracts from the opinion of the court (delivered by Judge Simpson), than by any other means I can adopt. After stating the case and making some remarks with respect to the jurisdiction of the courts, the opinion proceeds: “That part of the revised statutes which was adopted by the legislature during the session of 1850-51, contains the following section, under the head of Revenue and Taxation, ch. 83, art. 2, 'i 4: On a license to a merchant to sell spirituous liquors, five dollars. *Bicenses to merchants shall be granted by the County courts, only upon satisfactory evidence that the applicant is in good faith a merchant, and his business is that of retailing merchandise; and he has not assumed the name and business of a merchant with the view and object of obtaining a license to sell spirituous liquors.”
At the subsequent session of 1851-52, an act was passed by the legislature, by which it was enacted, that no license to a merchant to sell spirituous liquors, shall be granted by the clerk of any county, but only by *347 the County' courts, who may, in their discretion, grant such licenses, provided the applicant is in good faith a merchant. This act was approved the 13th of December 1851. Subsequently, on the 7th of January 1852, during the same session, the remaining chapters of the revised statutes were adojJted. One of the chapters on the subject of taverns, tippling-houses, &c. (ch. 99, art. 2), contains the following section: “A merchant may sell at his store-house, to be taken off and drunk elsewhere than on his premises, or adjacent thereto, any wine, spirituous liquors, or the mixture thereof, in any quantity not less than a quart. But before he shall so sell, he shall obtain from the Cormty court a license therefor.”
The opinion then proceeds to state that the revised statutes did not take effect till the first day of July 1852; the operation of those adopted at the first session of the legislature, as well as those adopted at the subsequent session, being postponed until that time; and that the application for a license in that case was made after the revised statutes had taken effect.
The concession is then made, that “the correctness of the order of the County and Circuit courts depended upon the question whether the act of the 13th *Dccember 1851, so far as its provisions are applicable to this subject, was still in force, or had been virtually repealed by' the revised statutes.”
The inconsistency between the act of December 1851 with the provisions of the revised statutes in relation to the rights conferred by it on merchants to vend spirituous liquors, is thus discussed and shown:
“This right in its qualified form, that is that not less than a quart shall be sold to be taken off and drunk elsewhere than on the premises, is by the revised statutes conferred absolutely upon merchants, subject only to the condition that they shall, previous to its exercise, obtain from the County court a license for the purpose. The County court has no discretion upon the subject. It must ascertain judicially the qualifications of the applicant; and if they be such as the law requires, he is entitled to a license as a matter of right. At the time of the adoption of the first part of the revised statutes, and prior thereto, a license to a merchant was granted by the clerks of the County courts. The law required it to be taken out merely for the purpose of increasing the revenue. The only change in the law contemxdated by this part of the revised statutes, was a transfer of the power to grant licenses, from the clerks of these courts to the courts themselves. The only object of the change was, that the qualifications of the applicant might be judicially enquired into, and an existing evil be thereby guarded against. It sometimes hapx>ened that persons who were not such actually', assumed the name and business of a merchant, with the view of obtaining a license; and under that assumed character procured one from the clerk when it should not have been granted. To remedy this evil, the change in the law was made, and the power to grant licenses to merchants conferred on the County courts. The statute imposed a duty on the court. It not only conferred ^jurisdiction to grant a license, but enjoined its exercise.” —“Now if the act of the 13th of December 1851 be in force, it produces a material change in the law upon this subject. The merchant has not even a certain qualified right to obtain a license; he has no right whatever; the County court may grant or refuse a license at its discretion. This act, therefore, is in this respect absolutely and entirely inconsistent with the provisions of the revised statutes.”
The inconsistency between the act of 1850-51 and the provisions of the revised statutes being thus shown, the court then express the opinion that the former was repealed by the latter; and on this ground reverse the action of the Superior court declining to interfere with the refusal of the County court to grant the license. The case, therefore, so far as it can be cited as an example of judicial opinion worthy of respect in the consideration of the questions in hand, bears with all its weight in favor of the judgment under review.
The case of The Com’rs of the Poor v. Lynah, 2 McCord’s R. 170, it is suggested, is a decision in favor of the proposition that when an inferior tribunal clearly abuses a discretion with which it is vested, it may be controlled by mandamus. Mr. Justice Colcock, in delivering the opinion of the court in that case, it is true, did say, ‘ ‘That whenever a discretion is given, the court will not interfere, unless it be clearly shown that this discretion has been abused.” If from this expression we are to imply the opinion that the court ought to interfere where there is such abuse, it is manifest, from a report of the case, that such oxnnion was uncalled for and extrajudicial; for in that case the court refused to interfere. And the case, therefore, I think, ox^poses no force to the strong current of authority to which reference has been had, all tending to the result that for such abuse of discretion by an ^inferior court, the remedy is to be found not in the civil but in the criminal process of the superior courts.
The same remark applies to some dicta of Judge Tucker in the case of Brander v. The Chesterfield Justices, 5 Call 548. In that case, a rule was made, in the District court, against the justices, to show cause why a mandamus should not be awarded, commanding them to cause the necessary repairs to be made to a bridge; in answer to which, the justices showed for cause: 1. That if the plaintiff had a right to redress, he had a different specific legal remedy' by appeal or supersedeas. 2. That the order of the County court refusing to let the repairs of the bridge, was made in the exercise of their judicial authority: And for this latter reason, the District court decided that it had no power to award the mandamus. This court affirmed the judgment of the *348 District court, on the ground that the matters of fact set out in the bill of exceptions were not sufficient to justify a mandamus; but at the same time expressed the opinion that the reason assigned by the District court for its judgment, was not a good one. And Judge Tucker, in delivering his opinion, said, that he did not regard the order of the County court as one made in the exercise of their judicial authority; but in another character, to wit, as commissioners of police for the county; and he proceeded farther to express the opinion that, in permitting the erection of mills, in granting licenses to tavern keepers, and in making orders for building court-houses, &c., the justices performed the functions of commissioners of police, and not of judges. He does not, however, say how far he would interfere with the action of the justices in the performance of these functions. The° case did not make it necessary that he should do so; and indeed, so much of the opinion of the court as negatived the validity of the claim of the '^justices to have acted in a judicial capacity in refusing to make the order for repairing the bridge, was uncalled for, in as much as the decision of the District court was affirmed on the merits. ' There is clearly nothing in the case which can be referred to as authority trammeling the action of the court in considering the question now before us.
Deft thus free to consider the case as one of the first impression in this court, I have, after the most careful deliberation which I have had in my power to give to it, come to the conclusion, that by the act of 1849 the legislature intended to clothe the County courts with a discretion in the matter of granting licenses for houses of . entertainment, in the exercise of which the justices are not liable to be overlooked or controlled by way of mandamus. And as the petitioner, with the view of testing the question whether the Superior court could, or ought to, review the action of the County court in any mode, presented, at the same time with his petition for the writ in this case, two other petitions: one for a writ of error to a refusal of the Superior court to grant him a writ of error; and the other for a like writ to the refusal of the said Superior court to grant him a certiorari, to the order of the County court, I think it proper to add, for reasons which may be collected from views of the law already expressed, that I think there is no mode by which the action of the justices can be appealed from. That the petitioner, by the proof which he furnished in reference to his character, and the probability of his keeping such a house as is contemplated by the law, and by producing to the court the sheriff’s receipt for the tax imposed by law on ordinaries, showed that he was a person to whom the County court, if they thought fit, might have granted and may still grant a license; but that he did not thereby acquire any such right to said license, as ^places it in the power of the Circuit court, at his instance, to say to the County court, through the medium of any legal proceeding, that they shall grant it.
Whether or no the justices can in any case under our law, be proceeded against by way of information or indictment, for any alleged willful abuse of their discretion in refusing to grant such licenses, isa question not before us, and about which I deem it unnecessary and improper to express any opinion.
I think the judgment ought to be affirmed.
ADDER, MONCURE and DEE, Js., concurred in the opinion of Daniel, J.
SAMUEDS, J., dissented.
Judgment affirmed.