# CHARLESTON.

WELCH *et al.* *v.* COUNTY COURT OF WETZEL COUNTY.

Submitted June 17, 1886.—Decided November 13, 1886.

1. APPEAL—JUDICIAL DISCRETION.

The rule, that matters of discretion are not subject to review, must be confined to cases, which are *purely* matters of discretion, or such, as in their result can not do injury. But, whenever in the exercise of discretionary powers it appears, that the discretion exercised was not a *pure* discretion but a sound judicial discretion, and this discretion has been perverted and abused, or that its exercise has been in violation of established rules and precedents and to the injury of any body, its exercise is subject to review, and it may be reversed by an Appellate Court. (p. 67.)

2. APPEAL—CERTIORARI—JUDICIAL DISCRETION—WRIT OF ERROR— RE-LOCATION OF COUNTY-SEAT—WRIT OF CERTIORARI.

A writ of *certiorari* is not a writ of right, but the issuing of it is dependent on a sound judicial discretion, and a refusal of a Circuit Court to award it on a proper petition to review the proceedings of the County Court in ascertaining and declaring the result of the vote on a re-location of a county-seat, may be reviewed by writ of error issued by the Supreme Court of Appeals. (p. 72.)

3. RE-LOCATION OF COUNTY-SEAT—PERMANENT LOCATION.

The provisions of the statute prescribing the manner, in which the county-seat of a county may be re-located by a vote of the people at a general election, apply to all the counties in the State including those, the county-seats of which were declared permanent by the special act of the legislature creating them. (p. 86.)

4. RE-LOCATION OF COUNTY-SEAT—NOTICE OF ELECTION—PUBLI-
    CATION.

The manner of giving notice, that such a vote is to be taken, pre-
scribed by the statute, is substantially though not literally com-
plied with, when the clerk of the County Court after the adjourn-
ment of the court makes out and certifies a copy of the order,
made by such court at a regular session, that a vote be taken at the
next general election, to be held in said county, upon the question
of the re-location of the county-seat at the place named in the pe-
tition to the County Court, and printed copies of this order and of
the certificate of the clerk of the court including his signature are
posted at each of the places of voting at least forty days before the
day of such election, and, if a newspaper is printed in said county,
when the said clerk shall cause a copy of said order to be published
therein at least once in each week for four successive weeks prior
to said election. (p. 89.)

5. RE-LOCATION OF COUNTY-SEAT—COMMISSIONERS OF ELECTION.

The requirement, that the commissioners of election of each place
of voting shall make out and sign a separate certificate of the result
of the vote and deliver the same to the clerk of the County Court
within four days, excluding Sundays, after the day, on which the
election is held, is mandatory not directory; and, if it be not com-
plied with at any place of voting, that fact vitiates the determina-
tion of the question, whether the county-seat shall be re-located by
the votes cast at that election; and this provision of the law can
not be regarded as substantially complied with, if the commissioners
of election at each place of voting insert the result of the vote at
such place in the certificate, or in one of the certificates, which
they are required to make out and sign, of the result of the
vote for each candidate voted for, such separate certificate and
the delivery of it by the commissioners of election at each
place of voting within four days, Sundays excluded, after that,
on which the election was held, to the clerk of the County
Court, and the requirement, that he shall lay it before the County
Court at its next session thereafter, being regarded as designed
in part to prevent the fraudulent alteration of such certificate. (p. 90.)

Statement of the case by GREEN, JUDGE :

B. M. Weclh and fifty-four other citizens and tax-payers
of Wetzel county in this State applied by petition to the
Circuit Court of said county for a writ of *certiorari* against
the County Court of said county to require said court to re-
move the record of its proceedings in relation to the re-loca-
tion of the county-seat of said county into the Circuit Court

of said county. The petition set out, that on June 17, 1884, David Barr and eight hundred and two other citizens or persons said to be citizens of Wetzel county, filed their petition in the County Court of said county praying a re-location of the county-seat thereof at Wileyville in Centre district in said county on a certain lot of ground designated in the petition ; and thereupon said County Court ordered, that a vote be taken at the next general election to be held in said county on the second Tuesday in October, 1884, upon the question of the re-location of said county-seat at Wileyville upon a certain lot described by metes and bounds containing one acre ;—that on said day a vote was accordingly taken on said question ;—that the County Court of said county seven days afterwards examined the ballots, poll-books and certificates returned from the district and voting-places in said county ;—that the fifty-four petitioners above referred to appeared before the said County Court and objected to the counting of said vote or the declaring of any result of the said election as to the said question of the re-location of said county-seat, on the ground that there were no separate certificates of said vote on this question filed with the clerk of the County Court of said county, as is required by the 15th section of chapter 5 of the acts of 1881;—that the said County Court overruled this and all other objections of the petitioners and declared the county-seat of said county to be removed from New Martinsville and re-located at Wileyville in said county ;—and that said court appointed the president and one of the commissioners thereof and a third person to prepare and submit to the said court plans and specifications for the necessary public buildings to be erected at Wileyville including a court-house and jail.

The petitioners in this petition assert that the action of the County Court was unwarranted, because, 1st, the petition for the re-location of the county-seat was not presented to, and the order for the election was not made by, said County Court at a regular meeting thereof duly named and appointed ;—2d, because said County Court did not ascertain, that the petition had been signed by the requisite number of legal voters in the manner prescribed by law, that is, by allowing one vote for every six persons, as shown by the last

preceding census;—3d, because the said clerk did not, as required by law, certify any copies of said order directing said vote on said question to be taken but instead gave to the sheriff printed copies of said order, which printed copies uncertified by the clerk were the only copies of said order posted by the sheriff;—and 4th, because the commissioners of election did not make out, sign and return separate certificates of the result of said election. The petition then concludes as follows : " Wherefore your petitioners respectfully charge, that the different orders herein referred to were made out without any authority of law, and pray, that your Honor grant to them a writ of *certiorari* directed to the County Court of Wetzel county commanding that court to certify and remove the record of its action in relation to the re-location of the county-seat of said county, and to produce before your Honor or the Circuit Court of said county the ballots, poll-books and certificates of the said election of the 14th of October, 1884, upon the question of re-locating the county-seat of said county with all the proceedings relating thereto, and to abide by and perform such order, as may be made in the premises, after all the matters and questions herein involved shall have been heard and determined." To this petition the following affidavit was appended :—

" STATE OF WEST VIRGINIA, WETZEL COUNTY, TO-WIT :

" Before the undersigned, clerk of the Circuit Court of Wetzel county, W. Va., in and for the county and State aforesaid, on this 19th day of December, 1884, and in the said county, personally appeared E. B. Snodgrass, one of the petitioners above named, who being duly sworn says, that the facts and allegations therein contained are true, except so far as they are therein stated to be on information, and that, so far as they are stated to be on information, he believes them to be true."

The following is a copy of the order showing the filing of said petition and the action taken on it by the Circuit Court of Wetzel :

*B. M. Welch, M. B. Davis, Jacob Koontz and others vs. The County Court of Wetzel County.*

PETITION FOR CERTIORARI.

"This day came B. M. Welch, M. B. Davis, Jacob Koontz

and others and with leave of the court filed their petition praying a writ of *certiorari* against the County Court of Wetzel county, requiring it to remove the record of the proceedings in relation to the re-location of the county-seat of said county, as specified in said petition, and to produce the same before this court, and to abide by and perform any order of this court, that may be made in relation thereto. After consideration by the court of the matters alleged and complained of in said petition, the court is of opinion, that none of the orders and proceedings of the County Court of Wetzel county in relation to the matters complained of ought to be reviewed, reversed or annulled on account of any supposed error set out in said petition. Therefore the court doth refuse to grant the writ of *certiorari* prayed for and doth dismiss the said petition."

From this judgment of the Circuit Court of Wetzel county B. M. Welch and the fifty-four other petitioners have obtained from this Court a writ of error.

*Ewing, Melvyn & Riley* for plaintiffs in error.

*James Morrow, Jr.,* for defendant in error.

GREEN, JUDGE :

The only question argued by the counsel for the defendant in error is :—Has this Court jurisdiction to review the judgment of the Circuit Court? He insists, that it has not, and urges the following reasons :—1st, because it was discretionary with the Circuit Court either to award or refuse the *certiorari,* and when that court has a discretion, its judgment can not be reviewed ; and 2d, because the order sought to be reviewed was not a final judgment, if it can be called a judgment at all, there having been but one party, the plaintiffs in error, before the court, when the order was rendered.

It was anciently held, that whatever rested in the discretion of the court could not be reviewed. This was applied to amendments of or the refusal to amend pleadings or the record in any part,—to the continuance or the refusal to continue common-law suits to another term,—to the granting of

or the refusal to grant new trials, and to a great variety of questions arising, while the case was being tried, and which were regarded as questions of practice under the control of the court below and not subject to review. But in most of the courts this doctrine has been for some time and is gradually changing; and in some of the States a very great change has taken place. In other States on the contrary it has been only slightly or not at all modified. There has been scarcely a perceptible change in this doctrine in the practice of the English courts or in the Supreme Court of the United States or in the Federal Circuit Courts, as will appear from the following cases :—*Meelish* v. *Richardson*, 23 E. C. L. 276; *The Marine Ins. Co.* v. *Hodgson*, 6 Cranch 206; *Tolland* v. *Sprague*, 12 Pet. 300; *Walden* v. *Craig*, 9 Wheat. 576; *Chiral* v. *Reinicher*, 11 Wheat. 280; *U. S.* v. *Buford*, 3 Pet. 12; *Pickett* v. *Legerwood*, 7 Pet. 144; *Bridlove* v. *Nicolet*, 7 Pet. 418; *Shier* v. *Bank*, 16 How. (U. S.) 571; *Spencer* v. *Tapsley*, 20 How. (U. S.) 494; *Wright* v. *Hollingsworth*, 1 Pet. 165; *Sime* v. *Hundley*, 6 How. (U. S.) 1; *Barrow* v. *Hill*, 13 How. (U. S.) 54; *Thompson* v. *Selden*, 20 How. (U. S.) 196; *Campbell* v. *Strong*, Hump. (U. S. C. C.) 265; *Welch* v. *Manderville*, 7 Cranch 152; *Day* v. *Woodworth*, 13 How. (U. S.) 363; *Young* v. *Black*, 7 Cranch 565; *Barr* v. *Graby*, Wheat. 213; *Blunt* v. *Smith*, 7 Wheat. 248; *Doswell* v. *De la Longa*, 20 How. (U. S.) 29; *Warner* v. *Morton*, Id. 448; *Schunchardt* v. *Allen*, 1 Wall. 371; *U. S.* v. *Gibert*, 2 Sumn. 20; *Henry* v. *Richetts*, 1 Cranch (U. S. C. C.) 545.

Many of the States have adopted the ancient doctrine and followed the English cases and the above cited cases of the U. S. Supreme Court. In other States, while the ancient doctrine has professedly not been repudiated, it has in fact been substantially modified, and cases have been reviewed, which would not have been reviewed by the English courts or by the Supreme Court of the United States. (*Powell* v. *Jopling*, 2 Jones 400; *Pendleton* v. *Pendleton*, Id. 136; *Campbell* v. *Barnhill*, 1 Jones 557; *Golloway* v. *McKeethan*, 5 Ired. 112; *Bradhurst* v. *Pearson*, 10 Ired. 157; *Green* v. *Cole*, 13 Ired. 425; *Caldwell* v. *Remington*, 2 Whart. 132; *Newlin* v. *Palmer*, 11

Serg. & R. 98). There are other decisions and some in the States, in which the above decisions were rendered, which apparently adopt the ancient doctrine. [*Tassey* v. *Church*, 4 Watts. & S. 141, (39 Am. Dec. 65); *Bedell* v. *Powell*, 13 Barb. 184; *Dibble* v. *Rogers*, 2 Mich. 407; *Warren* v. *McNulty*, 2 Gilman 355, (43 Am. Dec. 58); *Seaburg* v. *Stewart*, 22 Ala. 207, (58 Am. Dec. 254)].

Again in a number of States decisions have been rendered, which amount to a repudiation of the ancient doctrine, and from which the inference to be drawn is, that, wherever a subject of discretion is decided by the court below, the decision must be in accordance with sound judicial discretion, governed by established rules and principles, or at least it must not be palpably, in violation thereof; and, if it is, such decision though on a subject within the discretion, as it has been called, of the court below, will nevertheless be reviewed and reversed by the appellate court. (*Vanblaricum* v. *Ward*, 1 Blackf. 50; *Goldsby* v. *Robertson*, Id. 21; *Jones* v. *Cooper*, Id. 47; *Fuller* v. *State*, Id. 63; *Davis* v. *Gray*, 3 Litt. 451; *Maxwell* v. *McIlroy*, 2 Bibb 211; *White* v. *Hart*, 35 Ga. 269; *Avery* v. *State*, 26 Ga. 233; *McDonald* v. *Railroad Co.*, 26 Ia. 124; *Mansfield* v. *Wilkerson*, Id, 482; *Shumaker* v. *Howeler*, 22 Wis. 43; *Dobbins* v. *State*, 14 Ohio St. 304; *Hook* v. *Nanny*, 4 H. & M. 157, note; *Syme* v. *Montague*, Id. 180; *Milstead* v. *Redman*, 3 Munf. 219; *Higginbotham* v. *Chamberlaine*, 4 Munf. 557; *Jacobs* v. *Sale*, Gilmer 123; *Anthony* v. *Lawhorne*, 1 Leigh 1; *McAlexander* v. *Hairston*, 10 Leigh 486; *Power* v. *Tinnie*, 4 Call 411; *Shanks* v. *Fenwick*, 2 Munf. 478; *Keys* v. *McFatridge*, 6 Munf. 18; *Rohr* v. *Davis*, 9. Leigh 30; *Fisher* v. *Vanmeter*, Id. 18; *Slaughter* v. *Tutt*, 12 Leigh 147; *Brugh* v. *Shanks*, 5 Leigh 598; *Grayson's Case*, 6 Gratt. 712; *Wormley's Case*, 8 Gratt. 712; *Kates's Case*, 27 Gratt. 561; *O'Neal's Case*, Id. 582; *Hewitt* v. *Comm*, Id. 627; *Blosser* v. *Harshbarger*, 21 Gratt. 214; *Brown* v. *Speyers*, 20 Gratt. 308; *Bank* v. *Mathews*, 3 W. Va. 26; *Ressett* v. *Gardner*, Id. 531; *Davis* v. *Walker*, 7 W. Va. 447; *Wilson* v. *Wheeling*, 19 W. Va. 328: *Tefft* v. *Marsh*, 1 W. Va. 41; *Hoover* v. *State*, Id. 336; *Ott* v. *McHenry*, 2 W. Va. 72; *Campbell* v. *Lynn*, 7 W. Va. 665; *Shrewsbury* v. *Miller*, 10 W. Va. 115; *Lucas* v. *Locke*,

11 W. Va. 81 ; *Miller* v. *Ins. Co.*, 12 W. Va. 116 ; *Sweeny* v. *Baker*, 13 W. Va. 168 ; *State* v. *Williams*, 14 W. Va. 852 ; *Sheff* v. *Huntington*, 16 W. Va. 303).

But when the subject, upon which the inferior court has acted, is within its absolute or pure discretion, its action can not be reversed. ( *Craig* v. *Sabrell*, 9 Gratt. 132 ; *Boggess* v. *Robinson*, 5 W. Va., Syll. pt. 3, p. 402 and p. 413 ; *Ex parte Yeager*, 11 Gratt. 655 ; *French* v. *Noel*, 22 Gratt. 454 ; *Hein* v. *Smith*, 13 W. Va., Syll. pt. 1—p. 358). Such cases of pure discretion according to the views of the courts, who claim the right generally to review the decisions of inferior courts in reference to discretionary subjects, are comparatively few in number and relate to subjects, which, when not based on statute-law, are governed by no fixed rules and precedents and do not involve the essential rights of parties but pertain more to the convenient management of the business of the inferior court; or, when they do involve the substantial rights of parties, they are regulated by some statute, and by its terms or from the nature of the subject it is obvious, that neither the legislature nor the constitution never intended the action of the inferior court in these particular matters to be reviewed, or from their peculiar character they were not properly reviewable by an appellate court. With a few exceptions of this character the spirit, which pervades these decisions last above cited including the Virginia and West Virginia cases, is, that when a matter is to be decided by an inferior court, though it be called a subject of discretion, as the awarding of a new trial or the granting of a continuance, amendments of pleadings and many other matters, and this discretion is so exercised as to prejudice the substantial rights of a party, it may be reviewed at his instance by an appellate court and corrected by such court, when the inferior court has not exercised a sound judicial discretion in accordance with established rules and principles. This seems to me right.

Formerly these questions were doubtless matters of pure discretion and then properly not the subjects of review ; but they are no longer so, as the rules and principles governing them with the few exceptions, to which I have referred, have now become so settled and fixed, that these subjects

are really no longer matters of mere discretion, though still so called, the decision of the court in such cases being now really not the exercise of discretion proper but rather the application by the court below to the case before it of well known rules and principles of law; and if it errs in the performance of this judicial duty, its errors should be corrected by the appellate court, just as any other errors of law committed by it are corrected.

The above cited cases show, that the State-courts have made different degrees of progress in ridding themselves of the fetters put upon the appellate courts by this ancient doctrine. In some States scarcely any progress has been made. In Massachusetts for instance the ancient doctrine has been generally followed. Yet even there it has sometimes been questioned. (*Strong, Petitioner,* 20 Pick. 384; *Carpenter* v. *Bristol,* 21 Pick. 258). The difficulty in ancient times was, that in all such cases, when the subject was said to be in the discretion of the court, the principles governing them were so unsettled, that they could not have been regarded other than as matters of pure discretion. There was no controlling rule or principle; and of course there could be no error, when no rule or principle was violated. But now in most of the cases formerly called matters of discretion rules and principles have been laid down; and in many cases these rules are definitely and firmly fixed. In such cases these subjects should no longer be called matters of discretion; and, to distinguish them from what were anciently so called, they are now often called matters of sound judicial discretion, distinguishing them thus from matters, in which no rules or principles have been laid down to govern the discretion of the court, and which are now frequently spoken of as matters of pure discretion or matters belonging to the arbitrary discretion of the court. But, as I have said above, there are not many matters, which affect the substantial interests of parties, in regard to which rules and principles have not been laid down to govern the discretion of the court. In such cases the exercise of the discretion of the court must be a sound judicial exercise of such discretion, not an abuse of it; for it may be reviewed by an appellate court, and, if it has been obviously abused

to the prejudice of the party complaining, such abuse may be corrected. Powers in his work "Appellate Proceedings" Appendix, Note II, p. 406, after reviewing the subject at some length reaches a conclusion, which he expresses as follows :

"Upon consideration of the whole subject both as to principle, and what has been said and done by the courts in this country, we can come to no other conclusion, but that the rule, that matters of discretion are not subject to review and error, must be confined to cases, which are purely matters of discretion or in their result not injurious to the party complaining of them. But whenever in the exercise of discretionary powers it manifestly appear, that the discretion has been perverted and abused, or that the decision is contrary to well established rules and principles and to the injury of the party, then it must be subject to review in the appellate court like any other decision that is in violation of law and principle."

Whatever may be the law elsewhere, this correctly states the law in Virginia and West Virginia, as will appear on an examination of the numerous decisions in these States above referred to; and many other cases might be cited in both States, which are based on the law thus laid down by Powers, and which are in direct opposition to many of the decisions of the Supreme Court of the U. S. as well as many decisions in other States. We could not, if we were so disposed, change the law, as we have above stated it; for it may be regarded as settled by a long train of decisions both in Virginia and in West Virginia. But, as I have said it seems to me clear, that these Virginia and West Virginia decisions are based on correct views, which must ultimately be universally adopted. The progress of law can not be arrested by holding on to the ancient doctrine, which has become entirely unsuited to the law, as it now is throughout the United States.

The counsel for the defendant insists, that the writ of *certiorari* is not a writ of right at common-law (except at the suit of the sovereign) and cites to sustain the position 2 Bac. Abr. Art. " *Certiorari ;*" *Haine* v. *Campion*, 4 Halst. 22 ; *Duggen* v. *McGruder*, Walker (Miss.) 122, (12 Am. Dec.

527 and note).; *Matter of Highway*, 3 N. J. Law 579. There is no question, but this is the law. Thus it is clear, the writ of *certiorari* ought not to issue but should be denied, where there is other adequate remedy, or if it be a matter of no serious complaint or injury; but it is equally clear, that the allowance of a writ of *certiorari* is a matter of sound judicial discretion, not a matter of pure or arbitrary discretion. [*People ex rel. Onderdonk* v. *Supervisors*, 1 Hill (N. Y.) 195.] But that the granting of the writ of *certiorari* is not a matter within the pure and arbitrary discretion of the court is so fully shown by the note to the case of *Duggens* v. *McGruder* in 12 Am. Dec. referred to by counsel for the defendant in error, that it is hardly necessary to do more than quote, what is there said on the subject.

"The proposition asserted in the foregoing decision, that *certiorari* is not except upon the application of the king or the people a writ of right, is abundantly sustained by the authorities both at common law and under the practice in the United States. It is everywhere styled a discretionary writ. By this we do not understand, that the court or judge has the right to grant or refuse the writ capriciously; but that all the circumstances disclosed to the court are to be taken into consideration, and writ is to be refused or, if improvidently granted is to be quashed, unless substantial justice and equity will be promoted by the exercise of the supervisory authority of the superior tribunal (*Bannister* v. *Allen*, 1 Black 414; *Erwin* v. *Erwin*, 3 Dev. 528; *Bridge Co.* v. *Magoun*, 8 Greenl. 293.; *Drown* v. *Stimpson*, 2 Mass. 445; *Less* v. *Childe*, 17 Mass. 352; *Hun* v. *Grimes*, 2 N. H. 210; *Marc* v. *Baker*, 2 Cow. 396.; *People* v. *Supervisors*, 15 Wend 193; *Trustees of School* v. *School-Directors*, 10 Chicago L. N. 380; *Flournoy* v. *Payne*, 28 Ark. 87; *Railroad Co.* v. *County Comm'rs*, 112 Mass. 206.; *Keys* v. *Marine Co.*, 47 Cal. 252; *People* v. *Andrews*, 52 N. Y. 445; *Waldridge* v. *Waldridge*, 46 Vt. 617; *Knapp* v. *Hill*, 32 Wis. 467; 18 Albany L. J. 142). The discretion of the court is to be exercised as in other cases not from outside rumor nor from the representations of parties made out of court but from the petition and return or such other matters, as under the practice of the particular State are proper and competent for judicial

consideration. (*Scroggins* v. *State*, 55 Ga. 380.) If the pro-
ceedings objected to are merely 'informal, they will not be
set aside, if substantial justice has been done. If however
the action of the board or tribunal sought to be re-
viewed is wholly void for want of jurisdiction, it must be
vacated, although the action taken would be equitable and
meritorious, if proceeding from a tribunal having author-
ity to take it."

There can be no question, but that, while the writ of *cer-
tiorari* is discretionary in the sense above explained and not
a writ of right, still the discretion to be exercised is clearly
not a pure and arbitrary discretion but one regulated by
precedent and established principles; and therefore, what-
ever may be the law elsewhere, in Virginia and West Vir-
ginia a decision would be reversed, which awarded the writ
of *certiorari*, when according to precedents and principles
laid down as governing in such cases no writ should have
been awarded ; and on the other hand if a writ had properly
been awarded and was afterwards improperly quashed as
improvidently awarded, the appellate court would reverse
such decision ; and we will presently see, that the decision
would be reversed also, if the court had improperly refused
to grant such writ of *certiorari*, when the applicant had a
right to have it awarded in accordance with precedents and
principles laid down as regulating the issuing of such writ,
and he had no other redress except such review and reversal
of such decision. The authority to review a *certiorari* case,
when the case has been heard, both parties being before the
court below, is unquestionable, though the writ be a dis-
cretionary writ in the sense we have explained. Under the
numerous authorities both in Virginia and this State, which
I have cited, there could be no hesitancy on the part of this
Court to review a case of *certiorari* decided in the court be-
low. Such a case is undistinguishable from the numerous
cases, which the Virginia and West Virginia Court of Ap-
peals have reviewed, when the error complained of was the
refusal to award a new trial or grant a continuance to the
plaintiff in error, whereby he was improperly forced to try
the case, when he was unprepared. These are obviously
matters within the discretion of the court below in the same

sense as the issuing of a writ of *certiorari* is discretionary. In all these cases the discretion is regulated by precedent and established principles; and if such discretion is in any case abused, according to the decisions in this State and in Virginia such abuse would be corrected by an appellate court on review, though there are States, in which such abuse would not be reviewed. The following are *certiorari* cases, which have been the subject of review in this Court :—*Dryden* v. *Swinburn*, 15 W. Va. 234; *Board, &c.,* v. *Hopkins*, 19 W. Va. 84; *Fowler* v. *Thompson*, 22 W. Va. 106 ; *Poe* v. *Machine Works*, 24 W. Va. 517; *Chenowith* v. *Commissioners*, 26 W. Va. 230.

All of these cases were brought before us by writ of error, that having been decided in the first case to be the only proper way under our statute-law, though they could not have been brought before us in that way but for the statute. But in no case has a doubt as to our right to review such cases, because the writ of *certiorari* was not a writ of right but a discretionary writ, been suggested until the suggestion now made in argument by the counsel for the defendant. The numerous cases both in this State and in Virginia, which we have cited, show beyond question, that, whatever doubts may have been raised in other States or elsewhere as to the right to review a *certiorari* case, because it was discretionary with the court below to give the writ, there never could have been any question of the sort raised in this State or in Virginia. Though our jurisdiction in such cases was disputed in *Board, &c.,* v. *Hopkins*, 19 W. Va. 84, it was on entirely different grounds, which were applicable to that particular case. But if our general right to review cases of *certiorari*, where no special objection could be raised to our jurisdiction, had been questionable, it was settled beyond all possible dispute by the amendment to our constitution, which took effect on October 12, 1882. Article VIII, section 3, provides, that this Court shall have appellate jurisdiction "in cases of *quo warranto, habeas corpus, mandamus* and *certiorari.*" (Warth's Am. Code 23; *Board* v. *Hopkins*, 19 W. Va. 84; *Fowler* v. *Thompson*, 22 W. Va. 106.)

But it is insisted, that, though this Court may have jurisdiction by writ of error to review *certiorari* cases, there are

special reasons, why this Court can exercise no such juris-
diction in this case. These reasons are, that on the 10th of
February, 1885, when the order of the Circuit Court of Wet-
zel county complained of, that none of the proceedings or
orders of the County Court of Wetzel should be reviewed
and refusing to grant a writ of *certiorari* asked and dis-
missing the plaintiff's petition, was made, no defendant was
before the court but only the plaintiffs; and it was therefore
not a case, to which a writ of error could properly be
granted; nor was said order a final judgment, the defendant
having had no opportunity to be heard. Now it seems to
me, that the true principle to be deduced from the author-
ities as well as from reason is, that, when a court refuses to
grant a writ of error or *mandamus* or writ of prohibition or
writ of *certiorari* or other proper writ to remedy the wrong
complained of, and the person asking said writ has no other
remedy, though it is a discretionary writ, the appellate court
will by the appropriate writ review the order refusing to
grant such writ, though, when such order was made, no one
was before the court but the party complaining, and though
the other party had not been heard in the court below.; for,
if such order can not be reviewed by the appellate court,
there is a total failure in the law to furnish a remedy for a
wrong, a state of things, which it is the boast of the com-
mon-law can not exist; and because such order refusing to
award such writ, when the plaintiff has a right to have it
awarded and has no other remedy for the wrong, though not
technically a final judgment, is, so far as the plaintiff is con-
cerned, in its operation and effect a final judgment against
him just as really, as if the writ had been awarded and on
the hearing the case had been decided against him. No in-
justice or wrong is done to the defendant, as in such a case,
if the order of the court below refusing to grant such writ is
reversed, the order of the appellate court will be only, that
the writ shall be issued, and he will have his hearing, after
it is issued, before the lower court and has his hearing, before
the appellate court on the question of the propriety of issu-
ing such writ, when the writ prayed for in the court below is
a discretionary writ and not a writ of right. The following
authorities sustain this position:

In *Yates* v. *The People*, 6 Johns. 338, it was decided, that a writ of error would lie to the judgment of an inferior court on a writ of *habeas corpus*, though it was urged that it was not a judgment, and therefore error would not lie; that *habeas corpus* is a writ of privilege merely for the enlargement of the prisoner without touching his case; that it does not touch the merits. Spencer, Judge, refers among other authorities to Coke upon Littleton. On page 403 he says:—"Coke in his Commentaries on Littleton says: 'A writ of error lieth, when a man is grieved by an error in the foundation proceedings.'" He concludes by saying on page 407:—"Finally it appears to me to involve the highest absurdity to conceive, that the framers of our constitution and laws meant to create this high tribunal to correct the errors of our highest courts of judicature in civil cases and to leave the still greater and more valuable right of personal liberty unprovided for and unprotected by appeal to the highest court in a case, when in fact a judgment has been given."

In the case of *Etheridge* v. *Hall*, 7 Porter 56, Goldthwaite, Judge, says:—"It is said by Chancellor Walworth in the case of *Ex parte Negus*, 10 Wend. 34, that a writ of error would not lie on the denial of *mandamus* or *prohibition;* and it is only by virtue of a statute, that the judgment rendered on such writs can be reviewed for error in the English courts; and that it is yet an open question in these courts, whether the same rule does not prevail as to writs of *habeas corpus*." In New York it has been held, that a writ of error will lie on the refusal to grant a writ of *habeas corpus* ( *Yates* v. *The People*, 6 Johns. 402). Whatever may be the rule adopted by the English courts on this subject, we feel warranted by the decision last cited in deciding, that there is no reasonable distinction between the judgment of the court refusing to grant a writ and the one rendered on it; for the right of the citizen may be as much prejudiced by refusing to render him the means of attaining justice as by an incorrect judgment.

In the case of *The State* v. *Commissioners of Taledega*, 3 Porter 416, there was a denial of a *mandamus*, and on writ of error the case was reviewed without objection. But in

another *mandamus* case the Appellate Court gave its reasons·
for taking jurisdiction in the following language:

"If the judgment of the Circuit Court is to be considered
as final on the subject matter of the petition, there can
be no doubt of the authority of this court to reverse
its determination; and we can arrive at no other con-·
clusion. We are daily in the practice of reversing judg-
ments rendered on motion to quash ordinary writs of at-
tachments, which are certainly not more final in their char-
acter, than is the one we are considering. We conclude
then, that the judgment rendered in this case is such a final
judgment, as to give this court jurisdiction on a writ of er-
ror; and this judgment must be reversed and the cause re-
manded with directions to the Circuit Court to proceed in the
cause and issue the writ prayed for, unless sufficient cause·
be shown by the defendant against it."

In *Mayo* v. *Clark*, 2 Call. 276, it was decided, that, when:
a District Court refused to grant a *supersedeas* to the County
Court, the Court of Appeals will award a supersedeas to·
said order of the District Court. The Court of Appeals in
that case very properly declined to award a *mandamus* to
the District Court commanding it to award a *supersedeas* to
the judgment of the County Court. In that case there was
no party before the District Court but the plaintiff, and the
judgment of the District Court was not technically a final
judgment; but it was practically a final judgment, as the·
judgment of the County Court would necessarily remain in
force, if no *supersedeas* was granted by the District Court;.
for it alone was authorized to grant such *supersedeas*. And
this granting of a *supersedeas* was discretionary with the
District Court in precisely the same sense, in which the·
awarding of a writ of *certiorari* was discretionary with the
Circuit Court in this case. ·There is in my judgment no dif-
ference in principle between the case before us and *Mayo* v.
*Clark*.

There are other decisions precisely like the above. Thus
in *Williams* v. *Bruffy*, 12 Otto 248, it was decided, that in
a case, in which the Supreme Court of the United States had
jurisdiction to review a case decided by the Court of Ap-
peals of Virginia because of the character of the case when-

ever they had a right to review a case, in which there had been a final decree rendered by the Court of Appeals on a writ of error, they would have the same right to review, if the Court of Appeals had made an order refusing to award a writ of error. The syllabus on this point is:—"Jurisdiction attaches, whenever the highest court of a State by any decision, which involves a Federal question, approves or denies the validity of the judgment of an inferior court, over which it can by law exercise appellate authority, whether the decision after the examination of the record of that judgment be by refusing a writ of error or by dismissing a writ previously awarded." The ground upon which the Supreme Court of the United States regarded this refusal of the Court of Appeals of Virginia to award a writ of error to a judgment of the Circuit Court of Rockingham dismissing the plaintiff's action is stated by the court on pages 249, 250 as follows:

"By the law of Virginia the application is made to the Supreme Court of Appeals for a writ of *supersedeas.* The court looks into the record of the case and only allows the writ, when of the opinion, that the decision complained of ought to be reviewed. Its action upon the record is in effect a determination, whether or not it presents a sufficient question for the consideration of the court. If it deem the judgment of the court below plainly right and reject the application on that ground, and its order of rejection so state, no further application for the writ can be presented. The judgment of the court below is thenceforth irreversible. So in effect its refusal of the writ on the ground is equivalent to an affirmance of the judgment, for the reason that the record discloses no error."

This decision and reasoning appear to me to cover exactly the case before us, so far as the jurisdiction of this Court to review the order of the Circuit Court made February 10, 1885, is concerned. If that order had been based on the failure of the plaintiff, to notify the County Court of Wetzel, that they intended to apply to the Circuit Court of Wetzel for this writ of *certiorari* the case might have been different, as after the making of such order the Circuit Court of Wetzel might still have granted a writ of *certiorari* on the presentation by

the same plaintiffs of another like petition, after they had given such notice to the County Court; but this order on its face gives the following as its basis :—"After consideration by the court of the matters alleged and complained of in said petition the court is of opinion, that none of the orders and proceedings of the County Court ought to be reversed or annulled on account of any supposed error set out in said petition ; therefore the court doth refuse to grant the writ of *certiorari* prayed for and doth dismiss said petition." The court after this order could not grant a writ of *certiorari* on another petition presented by the same parties ; for in such a presentation the court would hold, that the matter complained of by them was *res adjudicata ;* and as under our law the Circuit Court of Wetzel has the exclusive jurisdiction to review the proceedings of any sort of the County Court, it is evident we can properly apply the language of the Supreme Court of the United States above quoted to this case ;. "So in effect its refusal of the writ on that ground is equivalent to an affirmance of the judgment for the reason that the record discloses no error."

The counsel for the defendant in his argument in this case admits, that the plaintiffs in error have no redress left, and insists, that this judgment of the County Court complained of is now forever irreversible. If the decision and reasoning of the Supreme Court of the United States is sound, for that very reason we should take jurisdiction and decide the writ of error, which we have awarded, and not dismiss it as improvidently awarded.

There have been recent decisions by our Court obviously based on the reasoning of the Supreme Court of the United States above quoted. In *Brazie* v. *Commissioners*, 25 W. Va.. 213, this Court entertained a writ of error to an order of a judge in vacation refusing to award a writ of prohibition to restrain the County Court of Fayette county from proceeding in a certain manner to ascertain and certify the result of an election for county-officers. The jurisdiction of this Court to hear and determine the writ of error appears to have been conceded, though there was a protracted controversy on the merits. *Chenowith* v. *Commissioners*, 26 W. Va. 230, was a case altogether similar to the case before us. It is a writ

of error awarded by this Court to the refusal of the judge of
the Circuit Court of Randolph county to award a *certiorari*
to the County Court of said county in certain proceedings
before that court, which had led to an election-case, which
had resulted in finding and declaring, that the petitioner had
received the same number of votes for sheriff, as his oppo-
nent.   We took jurisdiction in the case and decided, that the
facts alleged in the petition were sufficient to entitle the pe-
titioner to a writ of *certiorari*, and therefore reversed the or-
der of the circuit judge refusing to award such a writ, and
remanded the case to the said Circuit Court with directions to
award the writ and proceed in the case according to the
views of this Court stated in its opinion.   In that case too,
although it was contested not only on its merits but also on
technical points, the jurisdiction of this Court seems to have
been conceded; and for this reason we have reviewed the
principles, upon which we then acted, and we find, that that
decision was sustained not only by Virginian authorities but
also by the weight of authority elsewhere.

    There is a case in 11 Gratt. which in principle sustains the
position, that this Court has jurisdiction in such a case as
the one before us.   I refer to *Morris, ex parte*, 11 Gratt. 292,
in which it was decided, that, " if a Circuit Court refuse to
issue a *mandamus* in a proper case, the party may apply to
the Supreme Court of Appeals for a *supersedeas* or writ of
error and have the action of the Circuit Court reviewed and
corrected."   Judge Lee delivering the opinion of the court
said on page 294 :

    "I think, there can be no question as to the power of this
court to review the action of the Circuit Court in refusing to
award a *mandamus* upon an appeal from or writ of error or
*supersedeas* to the order refusing the same.   The order is fi-
nal, and in a case involving a civil right, not a matter of
controversy merely pecuniary, and the case is thus within
the general terms of the law providing the appellate juris-
diction.   * * * *   The review of an order refusing a *manda-
mus* is in entire conformity with the long settled previous
practice of this court in similar cases.   In *Mayo v. Clark*,
2 Call 276, a District Court had refused to grant a superse-
deas to an order of a County Court concerning a road.   The

Court of Appeals refused to grant a *mandamus* to compel the District Court to grant a *supersedeas*, but did grant a *supersedeas* to the order of the District Court refusing it. * * * Several other cases may be found in which the court of appeals has allowed writs of *supersedeas* to orders of inferior courts refusing to grant writs of *mandamus*. (*Dawson* v. *Thurston*, 2 H. & M. 132; *Dew* v. *Judges of Sweet Springs District Court*, 3 H. & M. 1; *Manns* v. *Givens*, 7 Leigh 689.)"

These cases cited differed from the one then before the Virginia Court of Appeals in this, that in the case before the court the Circuit Court as in our case refused the writ and dismissed the petition, when it was presented, while in the other cases it refused the writ after a rule to show cause had been issued and returned. But it is obvious, that the Court of Appeals considered, that this made no difference, and that the cases were substantially the same.

It seems to me therefore, that the able counsel for the defendants in error in *Chenowith* v. *Commissioners*, 26 W. Va. 230, while contesting the case, wherever a contest could be made, very properly conceded the jurisdiction of this Court in that case, which was a case like the one now before us. Upon these Virginia cases Judge Lee says:—"There can be no question of the power of the court to review the action of the Circuit Court in refusing to award the writ." The Virginia cases are binding authority upon us and independent of our own decisions settle our right to take jurisdiction in this case. There is also another decision rendered by this Court, which, if we had no other authority, would justify us in holding, that this order of the Circuit Court refusing to grant a writ of *certiorari* and dismissing the plaintiff's petition was in effect a final judgment, from which a writ of error lies to this Court. I refer to the decision in *Henen* v. *Railroad Co.*, 17 W. Va. 881, in which it was decided, that the order of a Circuit Court removing a case at law to the Circuit Court of the United States is reviewable by the Supreme Court of Appeals of this State by writ of error. In rendering that decision we followed the decisions of the Courts of Appeals of several States. (*Askesby* v. *Villas*, 24 Wis. 165; *Stat. ex rel.* v. *Judge, &c.*, 23 La. Ann. 27 (8 Am. Rep. 583);

*Stoker* v. *Leavenworth*, 7 La. 390; *Burson* v. *Bank*, 40 Ind. 173 (13 Am. Rep. 285).

There is really less difficulty connected with the taking of jurisdiction by this Court in such a case as this one now before us, than there was in the assumption of jurisdiction by the Court of Appeals of Virginia in like cases, because we have changed our law and no longer require the judgment of the Circuit Court to be final in order to authorize the Supreme Court to review it, but only require it to settle the principles of the case. While I think, the judgment, which we are called on to review, might well be treated as in effect final, as such judgments have often been, yet, it seems to me, it clearly settles the principles of the case; for it is admitted, that if the judgment stands, the judgment and action of the County Court will be irreversible and final. The principles of the case therefore are clearly as well settled by the order of the Circuit Court appealed from, as if the order had been made after the return of the County Court of Wetzel to a writ of *certiorari*, and the order had been in affirmance of the judgment of the County Court; for the order actually made is in effect such an affirmance. There is under our law no place for the exercise of ingenuity in settling, whether this judgment or order of the Circuit Court is technically a final judgment. The counsel for the defendant in error has devoted most of his argument to endeavoring to show, that this order of the Circuit Court is not technically a final judgment, and he insists it is no judgment, or at any rate not a judgment which can be reversed. To sustain this he refers to *State* v. *Wood*, 1 Zab. 682. This simply decides, that "A writ of error will not lie to Supreme Court for refusing to allow a *certiorari*." The reason given for this decision is simply that "the refusal to allow a writ of *certiorari* is a matter of discretion." This case simply shows, that New Jersey is one of the States, in which the decisions, which are called discretionary, can not be reviewed. We have seen that West Virginia is a State, in which these discretionary decisions can be reviewed. The same case is reported at greater length in 3 Zab. 560. The syllabus is: "A writ of error will not lie to reverse the decision of an inferior court refusing to allow a *certiorari*, such allowance not be-

ing a matter of right but resting on the discretion of the court." The reason here given would, we have seen, be regarded in West Virginia as no reason, this Court habitually reviewing decisions "resting on the discretion of the court below." There is in the opinion of the court a long and learned description by Chief Justice Green as to what "in any technical and appropriate sense may be denominated a final decision;" and this is the basis of the argument of the defendant's counsel. I do not deem it necessary to review it. Enough has been said to show that in this State as well as in many other States such an order refusing to award a writ of *certiorari* or other writ, though it be a discretionary writ, would be regarded, when this judgment could not be set aside in any other way, or the wrong complained of redressed, as in substance and effect a final judgment.

The case of *Allen* v. *Tyler*, 3 Vroom 501, is also relied on by the defendant. This decision was a refusal to award a writ of error to a decision of a court denying the application of the defendant to be discharged from arrest in a civil suit on contract, when arrest was founded on affidavits, that the debt had been fraudulently contracted, because this was not a final order or judgment. I suppose this decision was right; but it seems to me to throw no light on what should be our decision in this case. The case of *Scott* v. *Burton*, 6 Texas 322 (55 Am. Dec. 782) is also relied on by the defendant. The syllabus of the case is: "The form of the final judgment is immaterial; but in substance it must show intrinsically and distinctly and not inferentially, that the matters in the record have been determined in favor of one of the litigants, or that the rights of the parties have been adjudicated. Therefore a judgment, that a defendant recover his costs, without an order, that the plaintiff take nothing by his suit, or some order equivalent thereto, is not a final judgment and an appeal from such judgment must be dismissed at the cost of the appellant." In the case before us the court in its order dismissed the plaintiff's petition. This was certainly the equivalent of, "an order, that the plaintiff take nothing by his suit," and clearly distinguishes the case before us from the Texas case. This case is relied on, as

were the New Jersey cases, to show, what is technically a final judgment. I do not deem it necessary to go into the discussion of this point; but I will say, that it is considered and discussed in my judgment more learnedly and accurately in the case of *Yates* v. *The People*, 6 Johns by Spencer J. 398-405.

In the investigation, which I have made, I have come across several cases apparently opposed to the case of *ex parte Morris*, 11 Gratt. 292, above cited. These cases hold, that the refusal to allow a writ of *mandamus* can not be reversed. It was so held in *State* v. *Cappeller*, 37 Ohio St. 121 ; but the reason given is, that after the refusal of *mandamus* by the inferior court the proper remedy is to apply for the writ to the Supreme Court of Appeals. When this can be done, the refusal of the writ by the inferior court would not either in form or in effect be a final decree, nor would it settle the principles of the case. It would then be like the refusal of an inferior court to award an injunction, which for a like reason could not be appealed from in this State. See *McDaniel* v. *Ballard*, 4 W. Va. 196. So it has been held in Missouri that a refusal of the court to award a *mandamus* can not be reviewed. See *Shreor* v. *Livingston Co.*, 9 Mo. 195 ; *Ex parte Shagy*, 19 Mo. 399. But in these cases the court assigns no reasons for its conclusion, and the opinions are very brief amounting to little more than an announcement of their conclusion. These cases can have very little weight or influence out of Missouri, where they are binding authority. So in New York the same has been held in two cases for special reasons. See 13 Wend. 130 and *People ex rel.* v. *Insurance Co.* But in these cases the court regards the proceeding as not the regular and proper proceedings in a *mandamus* case, and that the plaintiff had waived rights even in the last case, as it was presented ; and it was held, that under the circumstances the application for the alternative writ of *mandamus* was addressed to the discretion of the court, and the decision was therefore not reviewable. None of these cases, it seems to me, can properly influence our decision in this case, because of the diversity of our law from the law elsewhere. I conclude therefore, that we clearly have jurisdiction to decide this case and ought not to dismiss the writ of error as improvidently awarded.

The merits of this case have not been argued by the counsel for the defendant in error. We will examine its merits by considering in succession each ground of error assigned by the plaintiff in his petition for a writ of error. The first ground of error assigned is, that the County Court of Wetzel county had no jurisdiction in the matter of directing a vote on the question of the re-location of the county-seat, because by the special act of the general assembly of Virginia creating Wetzel county (Acts of 1846, ch. 65, § 17,) it is provided, that the *permanent* seat of the county shall be at New Martinsville; and therefore the whole proceedings in the County Court of Wetzel in reference to the removal of the county-seat were illegal and unauthorized. The counsel for the plaintiff in error claim, that the county-seat of Wetzel county and those of a few other counties, where a like provision were made, when the counties were formed, can be re-located, if at all, only by an act of the legislature; that the legislature has claimed and exercised this power, but that they have not considered, as their action shows, that the county-seats of these few counties could be changed by a vote of the people under the general law; that the first law of this State was passed in 1863, (Acts of 1863, p. 69, § 8); that Calhoun county was established by the Acts of 1855-6, ch. 108, § 2, with a *permanent* county-seat as in the case of Wetzel county, and was obviously not regarded by the legislature as subject to the general law, whereby county-seats could be changed by a vote of the people; for four years after the passage of this general law an act was passed changing the county-seat of Calhoun county. (See Acts of 1857, page 3.)

The case of *Hamilton* v. *Michels*, 7 Ohio St. 79, is referred to as showing what constitutes a county and the object of its creation, that it is a local sub-division of a State created by the sovereign power of the State, of its own will, without the solicitation, consent or concurrent action of the people who inhabit it, but superimposed on them by a sovereign and paramount authority; that it is created almost exclusively with a view to the policy of the State at large, for the purpose of political organization and civil administration in matters of finance, of education, of provision for the poor, of military organization, of the means of travel and transport,

and especially for the general administration of justice. This being the definition of a county given by the counsel for the plaintiff, they argue that this unusual provision in the act creating the county of Wetzel, that its *permanent* county-seat is fixed, must be regarded as fixing it for the *convenience* of the *State* in the administration of *justice* and of the government, and there can be no change of the location of the county-seat except by the power which fixed it. This is unquestionably true; and the question for our consideration in this case is: Has it not been changed by the power, which created it, or what is the same thing in effect, under its direction and in the manner provided by it? It seems to me, that the legislature has prescribed a mode, by which the county-seat of Wetzel or that of any other county in the State may be changed by a vote of the people. Thus the 15th sec. of ch. 39 of Warth's Amended Code provides: "Whenever the citizens of *any* county desire the re-location of their county-seat they may file a petition, &c." The section then prescribes the details of the manner, in which a county-seat may be re-located by a vote of the people of a county.

This language is as broad and comprehensive, as it can well be, and in terms applies to all counties. I can see no reason, why it should not apply to Wetzel as well as to any other county. The fact, that in the act of 1846, which established Wetzel county, instead of simply saying, that the county-seat should be at New Martinsville the act said the *permanent* county-seat should be there, it seems to me, can have no effect upon the meaning of this 15th sec. of ch. 39 of the amended code of W. Va. The truth would seem to be, that this declaration of the legislature of Virginia in 1846, that New Martinsville should be the permanent county-seat of Wetzel, never did have any meaning or effect. The ordinary mode of fixing a county-seat in an act upon organizing a county would have fixed the seat of the county then as permanently, as the organizing of Wetzel county did. In neither case could the county-seat be changed except by or under the authority of an act of the legislature, and by such an act or under such authority it could be just as well changed, when the legislature, which formed the county, declared that a designated place should be the *permanent*

county-seat, as when it did not. In either case the legisla-
ture might have changed the county-seat by a special act
designating, where the new county-seat should be, or by a
general act authorizing it to be changed by a vote of the
people.   It is perfectly true, as claimed by the plaintiff's
counsel, that the county-seat of Wetzel was located by the
legislature at New Martinsville without the consent or con-
current act of the people of Wetzel; and, because this was
so, there can be no pretence, that the people of Wetzel, one
or all of them, can make objection to the re-location of the
county-seat made in any manner the legislature may choose
to adopt.  There is no contract or pretence of contract with
them, that the county-seat shall be *permanently* located at
New Martinsville; nor can one legislature by declaring it
shall be prevent another from changing it in any manner it
may choose.   The legislature has, it seems to me, very wisely
concluded, that the voters of a county can more wisely de-
termine, where the county-seat of any county should be with
reference to the convenience of the people of the State in-
cluding themselves in the administration of the government
and of justice, than can the legislature, who necessarily are
in a larger degree ignorant of the location in a particular
county and of other facts, which should have influence in
the location of a county-seat.   Hence the legislature has very
wisely left it to the voters of each county in a prescribed
manner to re-locate a county-seat.   There is therefore noth-
ing in the first assignment of error, for which the order of
the Circuit Court complained of should be reversed.

The second assignment of error is, that the County Court
of Wetzel county did not ascertain, that the petition had
been signed by the requisite number of legal voters in the
manner prescribed by law, that is, by allowing one vote for
every six persons in the county as shown by the last census.
There is, it seems to me, nothing in this assignment of error.
The number of voters required to sign this petition is
by 15th sec. of ch. 39 of Warth's Amended Code, p. 255, fixed
at one-fifth at least of all the legal voters of the county, to
be estimated by allowing one vote for every six persons in
the county as shown by the last census.   There were ac-
cording to the petition presented to the Circuit Court asking

for the writ of *certiorari* 803 voters, signers of the petition
to the County Court, that is, one-fifth of 4,015; and if the
population of Wetzel county be estimated as six times this
number, it amounted to 24,090. That this is largely more
than the population of Wetzel county by the census of 1880,
this Court as well as the Circuit Court takes judicial notice.
It follows then, that 803 voters, who signed the petition to
the County Court of Wetzel in reference to the re-location of
its county-seat, were largely more than the number required
by the law; and it is entirely immaterial, how the County
Court ascertained this to be so, as they as well as the Circuit
Court and this Court can take judicial notice of the popu-
lation of Wetzel county at the last census and can then in
the mode prescribed by this law ascertain, whether the ac-
tual signatures to the petition were enough. In this case
the number of petitioners greatly exceeded the number re-
quired by the law.

The third assignment of error is, that the clerk of the County
Court of Wetzel did not make out and certify in the manner
prescribed by law and deliver to the sheriff to be posted copies
of said order of election but delivered instead printed copies,
no part of which, not even the signature of the said clerk,
was in writing, and such copies and no other were posted by
the sheriff. The 15th sec. of ch. 39 of Amended Code, page
255-6 of Warth's Amended Code, provides: "The clerk of
said court shall upon the adjournment of the court make
out and certify as many copies of the order (the one requir-
ing a vote to be taken on the re-location of the county-seat)
as there are voting places in the county and deliver the same
to the sheriff thereof, whose duty it shall be to post one of
said copies or cause it to be done at each of said places of
voting at least forty days before the day of such election."
The usual mode, in which this provision of the law is ex-
ecuted, is for the clerk to make out a copy of this order and
certify the same as a copy, and then for the sheriff to cause
to be posted a printed copy of this certified copy of this order
including the certificate of the clerk at the foot of it at least
forty days before the day of such election. From the state-
ments in the petition for a *certiorari* to the Circuit Court of
Wetzel I presume, that this was the mode, in which this

portion of the law was executed in this case. If so, there was no error committed in its execution; for, while it would not appear to be a literal compliance with the law above quoted, it is obviously a substantial compliance; and indeed the voters of the county would be much better notified of the question, which they were asked to vote upon at the next election, by such printed copies including the printing of the signature of the. clerk, than they would be by written copies certified and signed by the clerk, as the printed copies would be much more easily read than written copies. There was therefore nothing in this third assignment of error to justify the Circuit Court in awarding a writ of *certiorari*, or that would justify this Court in reversing the order of Circuit Court refusing to award a writ of *certiorari*.

There·was one ground, upon which the petition to the Cir-Ccuit Court for a writ of *certiorari* was based, which was not assigned as a ground of error in the petition to this Court for a writ of error, and which appears to have been abandoned by the counsel for the plaintiff. It was, "that said petition to the County Court was not presented to or the order of election made by said County Court at a regular ses-sion duly named and appointed. The law (15 sec. of ch. 39 of the Amended Code) provides, that said petition shall be presented, and order made, "at a regular session of the County Court of such county." It does not require such ses-sion to be named or appointed for such purpose.

The only other assignment of error is, that the commis-sioners of the election did not make out, sign and return sep-arate certificates of the result of this election at any of the pre-cincts of the county. The statute (ch. 39, § 15 of Am. Code) provides, "That the commissioners of election of each place of voting shall make out and sign a separate certificate of the result of said vote and deliver the same to the clerk of the County Court, and said clerk shall lay the same before the County Court at its next session thereafter." This, the petition to the Circuit Court of Wetzel for a *certiorari* says, the commissioners of election at every voting place utterly failed to do. The Circuit Court bearing in mind, that a writ of *certiorari* is a discretionary writ and not a writ of right, and that it should be refused, unless substantial justice and

equity requires it to be granted, and that all merely technical objections to the regularity of the proceedings of the inferior court should be disregarded, doubtless held this objection to be like all the others, which had been presented in this petition, merely technical, and this law requiring the commissioners of election at each place of voting to make out, sign and return to the County Court clerk a separate certificate of the result of said vote on the re-location of the county-seat, as merely directory and intended simply for the convenience of the County Court, refused to grant the writ of *certiorari*.

I must confess, that, when I first read this record, I was of that opinion; and I was confirmed in it, when after examining the other grounds of error in the proceedings of the County Court alleged by the plaintiff, I found them to be frivolous, and the petition for a writ of *certiorari* so worded as to be well calculated to mislead the court. It is probably true, that these commissioners did not wholly neglect to certify the result of the vote on the re-location of the county-seat at each of their several places of voting, but that they included the statement of this result in the same certificate with their statement of the result of the voting for the various officers, who were elected at the same election. The petition does not state this, but it does not say the contrary, nor does it say anything to induce us to think the contrary. The Circuit Court in view of the character of this petition doubtless assumed, that this was the fact; and regarding this as a substantial compliance with the law, it refused to award a writ of *certiorari*. The Circuit Court doubtless regarded the failure to make out a statement of the result at each precinct of the vote on the re-location of the county-seat in a separate certificate as not a failure to perform their duty substantially, provided a statement was made and certified by them in the certificate of the result of the voting at each precinct for different officers then voted for. This, it seemed to me at first, was true; but a more careful examination of our statute-law has caused me to change my opinion on this point.

The voting on the re-location of a county-seat and the election of a large number of State and county officers under

the law occur at the same time at a general election, and are conducted by the same officers, and each voter uses one ballot, on which are the names of the several persons for whom he votes, and the office which each is to fill, and also the words "for re-location" or "against re-location." But there is an essential difference under our present law as to the time and manner, in which the result of election of officers and the result of the vote on the re-location of a county-seat is ascertained and declared.

The mode in reference to the election of officers is to be found in ch. 3, secs. 20 and 21, and is as follows: The commissioners at each precinct make out at the close of the voting and sign two certificates, the form of which is given, stating how many votes at that precinct were given for each candidate for each office. The ballots are all sealed up by the commissoners, who or one of whom within four days thereafter deliver the ballots so sealed up, one set of poll-books and one of their certificates to the clerk of the County Court and the other certificate and set of poll-books to the clerk of the Circuit Court. On the 5th day after the election the commissioners of the County Court meet in special session at the court-house, and these clerks lay before them the ballots, poll-books and certificates which have been left with them by the different commissioners at the different precincts, and they may require the attendance before them of these precinct commissioners of election or any other person present at the election at any precinct and examine them on oath and make all proper orders necessary to procure correct returns and ascertain the true result of such election. And they may upon the demand of any candidate open and examine any of the sealed packages of ballots and re-count the same, after which they must re-seal them up in another envelope. When they have made their certificate as to each of the officers elected in a prescribed form, they are required to deposit the sealed packages of ballots in the County Court clerk's office, and he is required to carefully preserve them and the poll-books for one year, and, if there be no contest for any office, they are then to be destroyed without opening the sealed packages; and if there be such contest they are to be destroyed at the close of the contest.

The mode of proceeding, when at such election there has been a vote taken on the re-location of the county-seat, is prescribed in sec. 15, ch. 39 of Warth's Amended Code, pp. 255-6. The vote is taken, superintended, conducted and returned in the same manner as in the election of officers had at the same time; but the commissioners of election at each place of voting are required to make out and sign a separate certificate of the result of the vote on the re-location of the county-seat and are not to put the result of the vote on this question in the other certificate made out by them as to the result in their precinct of the voting for the several officers. This separate certificate of the result of the vote on this question of the re-location of the county-seat these commissioners at each precinct are required to deliver to the clerk of the County Court within four days after the election, and he is required to lay the same before the County Court at the next session, and they are thereupon required to ascertain and declare the result of said vote and enter the same of record.

The question is, whether this provision, that the certificate of the result of the vote on the re-location of the county-seat made out and signed by the commissioners at each precinct or voting place shall be a separate certificate and not be inserted in the certificate as to the result of the vote for each officer, is mandatory or simply discretionary. It is obvious, that these certificates might be tampered with and altered, after they had been signed by the commissioners at the different precincts, and, to prevent this, the legislature has made several provisions, which, so far as the certificates of the commissioners at the several voting places are concerned, will render it difficult to alter them, after they are signed, and, if any alteration be made, easy to detect the fraud and prevent it from being successful. In the first place in the election of officers the certificate is made out in duplicate, one of which is delivered to the clerk of the County Court, and the other to the clerk of the Circuit Court, who each keep them but for a few days, when they present them to the commissioners of the County Court, who are to meet in five days (Sundays excepted) to determine the result of the election. The difficulty of successfully altering these certificates is much increased by the fact, that they are in

duplicate and that one of them is placed in the custody of each of two officers, the clerk of the County Court and the clerk of the Circuit Court, and secondly, by the very short time, in which such alterations must be made, if the fraud is attempted. In the next place, to increase still further the difficulty of altering these certificates of the votes cast for officers, after they have been signed, the commissioners of election are required to write out in words the number of votes cast for each officer, it being much more difficult to change a written word than a figure. But if despite these precaution any of these certificates should be altered, after it was signed by the precinct commissioners, the law has made provisions for detecting and defeating the fraud. The precinct commissioners are required to seal up in an envelope all the original ballots cast at the precinct and write their names across the place or places where it is sealed, &c., so as to increase the difficulty of successfully opening these envelopes and tampering with the ballots; and then they or one of them is to deliver these sealed packages in person in four days (Sundays excepted) after the election to the clerk of the County Court; and within five days after the election (Sundays excepted) he is to deliver them to the County Court assembled to declare the result of the election of officers. And at the request of any candidate for office, if any fraudulent tampering with the certificates be suspected, the commissioners of the County Court are required to open the sealed envelopes containing the ballots and re-count them, when such fraud will probably be detected. Still further to facilitate such detection, should the ballots too despite all this precaution have been tampered with, the County Court is authorized to examine on oath the commissioners of election or any other person present at the election. When further it is borne in mind, that all this is done within five days after the election, it would seem, that the legislature has been very anxious to defeat attempted frauds whether by altering the certificates or otherwise in the election of officers.

The legislature has made less provisions to prevent the alteration of the certificate of the precinct commissioners of the result of the voting on the re-location of a county-seat; but this renders it the more incumbent on the courts to see,

that no provision tending to prevent such frauds shall be neglected or dispensed with by the commissioners at the different precincts.

In this case the law does not require the number of votes cast for and against the re-location of the county-seat to be written out in words by the commissioners in their certificates, nor does it require duplicate certificates to be made out and one delivered to the clerk of the County Court and one to the clerk of the Circuit Court.    Almost the only precaution against a fraudulent alteration of the certificate is that requiring the precinct commissioners to deliver their certificates of the result of such vote within four days after the election (Sundays excepted) to the clerk of the County Court in person, and requiring him to keep it in his custody and care till the next session of the County Court, when he shall produce it before the court, who shall ascertain and declare the result of the vote and enter it of record.    It will be seen at once, that the liability to a fraudulent alteration of the certificate of the precinct commissioners on this question would be much increased, if it should not remain all the time in the custody of the clerk of the County Court from the time it may be delivered to him, till the time it be laid by him before the County Court at its next session.    If then the precinct commissioners were allowed to insert the result of the vote on the re-location of the county-seat in the certificate of the result of the vote on the election of officers and make out no separate certificate, this certificate would under the law be delivered by the clerk to the County Court on the fifth day after the election (Sundays excepted) and would remain in their charge, till they had declared the result of the vote on the election of all the officers voted for, which in some cases might be more than a week, and then this certificate would be returned to the clerk of the County Court.    It is obvious, that there would be much more probability of a fraudulent alteration while it was thus out of the hands of the clerk than while in his care and custody.

But it may be said, that, if the certificate of the precinct commissioners in this case were not made out separately, but the result of the vote was inserted in the certificate of the result of the vote for officers in the manner required by law

in such certificate, that is, by writing out the number of votes cast for and against re-location in words instead of figures and by the making out of duplicate certificates, the risk of fraudulent alteration of the certificate would be less, than if the law had been complied with literally by the making out of a separate certificate. Perhaps this may be so, but if we dispense with the making out of a separate certificate, we can not without usurping legislative powers require, that there shall be two certificates of the vote on re-location, or require the number of votes for and against to be written out in words, and the insertion of the vote on re-location in figures in the certificate of the result of the vote for officers returned to the clerk of the county court would suffice.

Again it may be said, that the ascertainment of the true result of the vote on re-location, to be made by the County Court at its next session, would prevent any injury resulting from such attempted fraud more effectually, for the reason that the investigation of this question by the County Court in reference to the election of officers had been made five days after the election. If this were so, I do not see how it can effect the question under investigation; but it does not seem to me to be so. It is true in ascertaining the result of the vote on the re-location of the county-seat the County Court could exercise all the powers of any other court in making any investigation with possibly the exception of opening the sealed ballots, which the statute-law seems to forbid, except in case of contested election, though it may be too literal a construction of the law to say, that they could not be opened by the County Court in determining the question, whether the county-seat had been by the vote of the qualified voters re-located. But be this as it may, the opening of them by the County Court at its next session, perhaps 60 days after the election, and after they may have been once before opened by the County Court five days after the election on the demand of some candidate, would certainly be a far less efficient mode of detecting such a fraud, than it was, when they were first opened. For the very lapse of time itself would greatly increase the danger of fraud; and as the County Court could in their special session five days after election summon witnesses and examine them on oath, I

do not see, that their investigation then would not be even more efficient in defeating fraud than an investigation perhaps two months afterwards.

I am for these reasons of opinion, that we can not regard the law requiring a separate certificate of the precinct commissioners of the result of the voting at their precinct on the re-location of the county-seat as directory, but must regard it as mandatory. Of course, if they had failed to make out any certificate, they would probably have violated the law in a most important matter, and the County Court could not decide, that the county-seat was re-located at such an election. As it was expressly alleged in the petition to the Circuit Court for a writ of *certiorari* to bring before that court the proceedings of the County Court, in which said court declared, that the county-seat of said county was removed, that the commissioners of election at the several precincts did not make out, sign and return separate certificates of the result of the election on this question, as required by law, and as this petition was sworn to, in this preliminary stage it must be treated as true. The Circuit Court ought therefore to have awarded the writ of *certiorari* prayed for in the petition; and after the return of the County Court to this writ and proper investigation have decided the case.

For these reasons the order of the circuit court of Wetzel made Feby. 17th, 1885, must be reversed, set aside and annulled; and this Court proceeding to render such judgment, as should have been rendered, doth remand this cause to the Circuit Court of Wetzel with directions to award the writ of *certiorari* prayed for by the plaintiffs in their petition, and further to proceed with this case according to the principles laid down in this opinion, and further according to the principles governing courts of common-law. No costs are awarded the plaintiffs in this case, as, when the order complained of was entered by the Circuit Court, no persons other than the plaintiffs were before that court.

REVERSED.    REMANDED.